<u>Compression Labs, Inc. v. Dell Inc., et al.</u>
Civ. A. No. 2:04-CV-159-TJW (Judge Ward)

# EXHIBIT B
# TO THE DECLARATION OF
# ERIC M. ALBRITTON

Dockets.Justia.com

LICENSE AND CO-OWNERSHIP AGREEMENT

**CONFIDENTIAL**

THIS LICENSE AND CO-OWNERSHIP AGREEMENT is made and entered into as of this 24th day of ⟨June⟩, 1996 (the "Effective Date") by and between COMPRESSION LABS, INCORPORATED, a Delaware corporation with principal offices at 2860 Junction Avenue, San Jose, California 95134 ("CLI"), and CHARGER INDUSTRIES, INC., a California corporation with principal offices at 6262 Lusk Boulevard, San Diego, CA 92121 ("Charger").

In consideration of the promises and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

## AGREEMENT

1. **DEFINITIONS.**

    1.1    "**Affiliate**" has the meaning defined for such term in the Purchase Agreement.

    1.2    "**BPG**" means CLI's Broadcast Products Group.

    1.3.    "**CLI Field of Use**" means the videoconferencing business as it is currently conducted by CLI and as such business evolves in the future.

    1.4.    "**CLI Intellectual Property Rights**" means the Intellectual Property Rights enumerated on Exhibit A.

    1.5.    "**Charger Field of Use**" means the broadcasting business as it has historically been conducted by CLI and as such business evolves in the future.

    1.6.    "**Charger Intellectual Property Rights**" means the Intellectual Property Rights enumerated on Exhibit B.

    1.7.    "**Confidential Information**" means any confidential or proprietary information, source code, software tools, designs, schematics, plans or any other information relating to any research project, work in process, future development, scientific, engineering, manufacturing, marketing or business plan or financial or personnel matter relating to either party, its present or future products, sales, suppliers, customers, employees, investors or business, identified by the disclosing party as Confidential Information, whether in oral, written, graphic or electronic form. If disclosed in oral form, such Confidential Information must be reduced to writing and marked as Confidential Information within thirty (30) days following disclosure.    Without limiting the foregoing, all CLI Intellectual Property Rights and all Charger Intellectual Property Rights shall be deemed the Confidential Information of their respective owner.

    1.8    "**Customers**" means resellers, distributors, end users and other parties in the chain of distribution.

26423 v4/PA
KDZ051.DOC

1.

**1.9.** **"Intellectual Property Rights"** means the Patent Rights, know how and trade secrets of a party.

**1.10.** **"Jointly Owned Patents"** means those Patent Rights enumerated in Exhibit C.

**1.11** **"Marks"** shall have the meaning for such term set forth in Section 5.

**1.12.** **"Patent Rights"** means a patent or patent application and all foreign counterparts, substitutions, extensions, reissues, reexaminations, renewals, divisions, continuations and continuations in part relating to such patents or patent applications.

**1.13.** **"Products"** means any product or service used, exercised, made, offered for sale, sold or imported by a party hereto that falls within the scope of the Intellectual Property Rights of the other party or the Jointly Owned Patents.

**1.14** **"Purchase Agreement"** means the Asset Purchase Agreement between CLI and Charger dated June 7, 1996.

**2.** **JOINTLY OWNED PATENTS.**

**2.1.** **Joint Ownership.** CLI hereby assigns to Charger an undivided one-half (½) interest in the Jointly Owned Patents so that the parties are joint owners of the Jointly Owned Patents without any right of accounting. Both parties agree that they may use the Jointly Owned Patents in any way, subject to the field of use restrictions set forth in Section 2.2.

**2.2.** **Restriction on Use.** Charger shall have the right to practice the Jointly Owned Patents only in the Charger Field of Use. CLI shall have the right to practice the Jointly Owned Patents only in any field of use other than the Charger Field of Use. In the event that a party grants a license under the Jointly Owned Patents to a third party, the licensing party agrees to execute an agreement with its licensee that binds the licensee (and its sublicensees, if any) to the field of use limitations enumerated in this Section 2.2. This Section 2.2 shall terminate with respect to each Jointly Owned Patent upon the expiration of such Jointly Owned Patent or when there is a final determination of invalidity by a court of competent jurisdiction. The restrictions on the practice of a Jointly Owned Patent set forth in this Section shall only apply in the country in which such patent is valid and enforceable. Notwithstanding anything in this Agreement to the contrary, after the Effective Date, a party may assign its interest in a Jointly Owned Patent (subject to the restrictions and obligations set forth in this Agreement), but only in whole, not in part.

**2.3.** **Convergence.** The parties acknowledge the possibility that the parties' respective fields of use may converge as their respective industries and technologies evolve over time. As a result, to the extent that the Charger Field of Use and the fields of use other than the Charger Field of Use converge in the future due to industry or technology evolution, the restrictions on use set forth in Section 2.2, as they relate to both parties, shall not apply to the extent of the convergence.



CONFIDENTIAL

2.4.    **Maintenance.** The parties will each pay 50% of the maintenance costs of all Jointly Owned Patents. If one party refuses to pay such maintenance costs, the other party can pay the costs and bill the refusing party for its share.

2.5    **Infringement.** If either party learns of a third party infringement of a Jointly Owned Patent, that party shall promptly notify the other party of such fact. The parties shall then mutually agree on how to proceed with an enforcement action, including without limitation actions for past infringement of the Jointly Owned Patents occurring prior to the Effective Date. If the parties cannot agree, then if the infringement is limited to (1) Charger's Field of Use, Charger shall have the right to control the enforcement action, and (2) a field of use other than the Charger Field of Use, CLI shall have the right to control the enforcement action. The recovery from the enforcement action shall be split in proportion to the parties' contribution to the enforcement action's costs (including without limitation attorneys' fees). In the event that a party hereto declines to participate in an enforcement action, such party agrees, at the participating party's expense, to join the action as a party plaintiff and otherwise cooperate with the enforcement action in any way reasonably requested by the participating party.

2.6.    **Settlement.** Neither party shall enter into a settlement with a potential or actual infringer of a Jointly Owned Patent that interferes with or adversely affects the rights of the other party without such other party's prior written consent.

2.7.    **Declaratory Action.** In the event that a third party initiates an action for declaratory judgment related to a Jointly Owned Patent, the general principles specified in Sections 2.5 and 2.6 shall apply with respect to control of the defense, costs and settlement.

2.8.    **Proprietary Rights Notices.** Each party will cooperate to ensure that all Products carry intellectual property rights notices relating to the existence and ownership of their respective relevant intellectual property rights in the forms specified under U.S. law and/or the provisions of the Paris, Berne and Universal Copyright Conventions.

3.    LICENSES.

3.1.    **CLI License.** CLI hereby grants to Charger, under the CLI Intellectual Property Rights, a non-exclusive, worldwide, perpetual, irrevocable, fully paid license to make, have made, use sell, offer for sale and import Products in the Charger Field of Use. Charger may sublicense the foregoing rights to any Affiliate and may sublicense to third parties the foregoing right to make the Products for Charger or its Affiliates; other than the foregoing, the license to Charger in this Section 3.1 is not sublicenseable.

3.2.    **Charger License.** Charger hereby grants to CLI, under the Charger Intellectual Property Rights, a non-exclusive, worldwide, perpetual, irrevocable, fully paid license to make, have made, use sell, offer for sale and import Products in the CLI Field of Use. CLI may sublicense to third parties the foregoing right to make Products for CLI; other than the foregoing, the license to CLI in this Section 3.2 is not sublicenseable.

CONFIDENTIAL

**3.3.   No Obligations.**  Notwithstanding the licenses granted pursuant to Sections 3.1 and 3.2, neither party shall be obligated to transfer any technology or provide any technology or support to the other party or the other party's Customers.

**3.4.   License to Perform Assembly.**  Charger hereby grants to CLI a license, without right to sublicense, under the Charger Intellectual Property Rights to all rights necessary for CLI to perform its obligations under that certain Facilities and Services Agreement between CLI and Charger dated the date hereof.

**3.5.   Notice of Infringement.**  If either party learns of a third party infringement of the Charger Intellectual Property Rights or the CLI Intellectual Property Rights, that party shall promptly notify the other party of such fact.

**4.   SPECTRUMSAVER.**  The parties acknowledge and agree that SpectrumSaver was excluded from CLI's assignment of assets pursuant to the Purchase Agreement.  Charger agrees that (1) it will not assert any claims against CLI or CLI's Customers that the manufacture, use, offer for sale, sale and import of SpectrumSaver products, and improvements thereto, by CLI infringes the Charger Intellectual Property Rights, and (2) such manufacture, use, sale, offer for sale and import would not violate Section 2.2 of this Agreement, provided that, with respect to both items (1) and (2), neither CLI nor a third party to whom CLI sells or licenses such rights, modifies, improves or otherwise redesigns the SpectrumSaver products after June 7, 1996 so as to make such products compatible or compliant with the MPEG2 standards.

**5.   TRADEMARKS.**  Subject to the terms and conditions of this Agreement, CLI hereby grants to Charger a non-exclusive, perpetual (subject to the right to terminate as provided for in this Section), worldwide, royalty-free license to use CLI's trademarks "CDV" and "Compressed Digital Video" (the "Marks") in connection with Charger's marketing and sale of the Products.  In addition, subject to the terms and conditions of this Agreement, CLI hereby grants to Charger a non-exclusive, worldwide, royalty-free license to use, for a period of one year after the Effective Date, the CLI trademarks "CLI" and "Compression Labs, Incorporated" in connection with the encoders assembled by CLI pursuant to the Services Agreement.  Subject to the foregoing limitations, "CLI" and "Compression Labs, Incorporated" are included in the definition of "Marks".  Charger agrees to state in appropriate places on all products using the Marks that the Marks are trademarks of CLI and to include the symbol ™ or ® as appropriate.  CLI grants no rights other than expressly granted hereunder, and Charger acknowledges that CLI claims exclusive ownership of the Marks and that the Marks are of worldwide renown.  Charger agrees not to take any action inconsistent with such claim of ownership.  Charger shall not adopt, use or attempt to register any trademarks or trade names that are confusingly similar to the Marks in the field of telecommunications or computer equipment or software or in such a way as to create combination marks.  CLI may terminate, in whole or in part, Charger's license to use the Marks if, in CLI's reasonable discretion, Charger's use of the Marks does not conform to CLI's standards for such usage as provided to Charger in writing, and provided that such non-conforming use is not cured within thirty (30) days after Charger receives written notice that such use does not conform to CLI's standards.  One such use standard is that Charger shall manufacture products bearing the Marks in accordance with Charger's (or its Affiliates') normal manufacturing quality

CONFIDENTIAL

control procedures as specified in the Site Quality Manual dated August 10, 1995, as amended from time to time.

6.    NO WARRANTIES.  Except with respect to Intellectual Property (as defined in the Purchase Agreement), which are governed by the provisions of the Purchase Agreement, all Intellectual Property Rights and other deliverables delivered to the other party hereunder are provided "AS IS" and without any warranty of any kind, including without limitation warranties of title and non-infringement.

7.    CONFIDENTIALITY.

    7.1.    Confidentiality.  Each party hereto will maintain in confidence all Confidential Information disclosed by the other party hereto. Neither party will use, disclose or grant use of such Confidential Information except as expressly authorized by this Agreement. Each party will use at least the same standard of care as it uses to protect its own confidential information of a similar nature to ensure that its employees, agents or consultants do not disclose or make any unauthorized use of such Confidential Information, and each party represents that such standard of care is at least that customarily employed in the industry to protect the confidentiality of such information.    Notwithstanding the foregoing, each party shall require its employees and consultants, if such employee or consultant has not already done so, to sign confidentiality and nondisclosure agreements with such party consistent with the confidentiality requirements set forth herein. Each party will promptly notify the other party upon discovery of any unauthorized use or disclosure of the Confidential Information.

    7.2.    Exceptions.  The obligations of confidentiality contained in Section 7.1 will not apply to the extent that it can be established by the receiving party by competent proof that such Confidential Information:

        (a)    was already known to the receiving party, other than under an obligation of confidentiality, at the time of disclosure by the other party;

        (b)    was generally available to the public or otherwise part of the public domain at the time of its disclosure to the other party;

        (c)    became generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of the receiving party in breach of this Agreement;

        (d)    was disclosed to the receiving party, other than under an obligation of confidentiality, by a third party who had no obligation to the other party not to disclose such information to others;

        (e)    was independently developed by the receiving party without the use of such Confidential Information; or

        (f)    was disclosed by the owner to a third party without any restrictions on disclosure.

26423 v4/PA
KDZ05l.DOC                                5.                        CONFIDENTIAL

**7.3.    Authorized Disclosure.** Each party may disclose Confidential Information to manufacturing sublicensees provided that such disclosure is made pursuant to a nondisclosure agreement which contains provisions at least as protective of the other party's interests as those contained in this Section 7. Each party may disclose the Confidential Information to the extent such disclosure is reasonably necessary in filing or prosecuting patent applications, prosecuting or defending litigation or complying with applicable laws, court orders or governmental regulations, provided that if such party is required to make any such disclosure of the Confidential Information it will to the extent practicable give reasonable advance notice to the other party of such disclosure requirement and, except to the extent inappropriate in the case of patent applications, will use its best efforts to secure confidential treatment of such information required to be disclosed. The parties acknowledge that the sale of the Products may necessarily disclose Confidential Information of the parties and the parties agree to use commercially reasonable efforts to limit such disclosure.

8.    **GENERAL.**

**8.1.    Bankruptcy.** All rights and licenses granted under or pursuant to this Agreement by each party are, for purposes of Section 365(n) of the U.S. Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code.

**8.2.    Assignment.** This Agreement and each and every covenant, term and condition hereof shall be binding upon and inure to the benefit of the parties and their respective successors and assigns. Either party may assign its rights and obligations hereunder, in whole or in part, to a successor in interest to all or substantially all of the assigning party's business, business unit or product line to which this Agreement or such party's rights and obligations relate, provided that the party to which such rights are assigned assumes in writing the obligations corresponding to such rights. CLI may otherwise assign this Agreement or other rights under this Agreement to third parties provided that CLI notifies Charger in writing of the identity of the potential assignee and the terms of such potential assignment and Charger shall have 30 days in which to accept such terms in writing and become CLI's assignee on such terms, in which event the assignment to Charger shall be consummated as soon as reasonably possible. In the event that Charger does not accept the terms of such assignment within the 30 day period, CLI may consummate the assignment with the specified third party on terms no more favorable to the third party than the terms offered to Charger. Any assignee must consent in writing to the terms of this Agreement. Any other assignment of this Agreement or rights or obligations hereunder, by operation of law or otherwise, shall be made only with the other party's prior written consent, and any assignment made in violation of the foregoing is void and of no effect.

**8.3    Further Assurances.** Each party will execute all documents and take all actions necessary or desirable to effectuate the parties' intent under this Agreement as reasonably requested by the other party and at the requesting party's expense. To effect the provisions of Section 2.1 and the terms of the Purchase Agreement, concurrently with the execution of this Agreement, each party shall execute, and cooperate in recording with the appropriate governmental authorities, the assignment documents attached hereto as Exhibits D and E.


CONFIDENTIAL

**8.4.    Equitable Remedies.** The parties acknowledge and agree that any breach of this Agreement may cause irreparable harm for which money damages may be inadequate and therefore the non-breaching party shall be entitled to injunctive relief, without obligation to post a bond, to prevent a breach or continuation of a breach, in addition to any other remedies available at law.

**8.5.    Export Control.** With respect to the distribution or sale of any Products, each party shall fully comply with the export administration and control laws and regulations of the United States of America, as such may be amended from time to time. The parties agree not to take any action that would cause the other party to violate the U.S. Foreign Corrupt Practices Act of 1977, as amended.

**8.6.    Independent Contractors.** Nothing contained in this Agreement shall be construed so as to make the parties agents, partners or joint venturers or, except as explicitly set forth herein, to permit either party to bind the other party to any agreement or purport to act on behalf of the other party in any respect.

**8.7.    Waivers and Modifications.** Except as otherwise provided herein, no waiver or modification of any of the terms of this Agreement shall be valid unless in a writing signed by both parties. Failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of such rights, and a waiver by either party of a default hereunder in one or more instances shall not be construed as constituting a continuing waiver or as a waiver in other instances.

**8.8.    Severability.** If any term or provision of this Agreement shall for any reason be held to be invalid, such invalidity shall not affect any other term or provisions hereof, and this Agreement shall be interpreted and construed as if such term or provision had never been contained herein.

**8.9.    Notices.** All notices hereunder must be in writing and shall be given or made at the respective addresses of the parties as set forth above, unless notification of a change of address is given. All notices hereunder shall be mailed by certified or registered mail, return receipt requested, or sent by overnight courier, or by confirmed facsimile. Any notice given pursuant to this Agreement by mail shall be considered effective three days after mailing. Any notice sent by overnight courier shall be considered effective one day after mailing. The date of transmitting any notice sent by facsimile shall be deemed to be the date the notice is transmitted.

**8.10.    Headings.** The section headings of this Agreement are inserted only for convenience and shall not be construed as part of this Agreement.

**8.11.    Mediation.** Within 15 days of notice of any dispute, the parties agree that the parties shall try in good faith to settle any dispute arising hereunder by non-binding mediation prior to the commencement of any litigation (other than an injunction).

**8.12.    Governing Law.** This Agreement shall be construed and governed in accordance with the laws of the State of California without giving effect to laws concerning conflicts of laws.

CONFIDENTIAL

Any suit hereunder may be brought in the federal or state courts of Santa Clara County, California, and Charger hereby consents to the jurisdiction thereof. In no event shall this Agreement be governed by the United Nations Convention on Contracts for the International Sale of Goods.

**8.13. Force Majeure.** Neither party shall be liable for delays in performance of, or failure to perform, any of its obligations hereunder occasioned by any cause beyond its reasonable control, including, but not limited to, war, civil disturbance, labor difficulties, fire, flood, earthquake, defaults or delays of common carriers, suppliers, or governmental laws, acts, or occurrences. Any such delay shall effect a corresponding extension of performance date.

**8.14. Entire Agreement.** This Agreement, together with the exhibits attached hereto, comprises the entire, final and exclusive understanding of the parties with respect to the subject matter herein and supersedes any previous agreement, whether oral or written, with respect to such subject matter. Notwithstanding the foregoing, to the extent that any provision of this Agreement conflicts with the Purchase Agreement with respect to any provisions applicable to the Jointly Owned Patents and any Intellectual Property (as defined in the Purchase Agreement) assigned under the Purchase Agreement, the terms of the Purchase Agreement shall prevail.

CONFIDENT!

IN WITNESS WHEREOF, the parties hereto have this day caused this Agreement to be executed by their duly authorized officers.

**Compression Labs, Incorporated**         **Charger Industries, Inc.**

By: _____              By: _____

Title: _Pres., CEO._____           Title: _____

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have this day caused this Agreement to be executed by their duly authorized officers.

Compression Labs, Incorporated

By:_____

Title:_____

Charger Industries, Inc.

By:_____

Title:_____Vice President_____

CONFIDENTIAL

## EXHIBIT A

## CLI INTELLECTUAL PROPERTY RIGHTS

U.S. Patent Number 4,710,813

U.S. Patent Application number 08-486279

All trade secrets and know how associated with the foregoing patent and patent application

CONFIDENTIAL

**EXHIBIT B**

**CHARGER INTELLECTUAL PROPERTY RIGHTS**

U.S. Patent Numbers 4,385,363 and 5,506,844

U.S. Patent Application number 08-162511

All trade secrets and know how associated with the foregoing patents and patent application

All trade secrets and know how developed by CLI's Research and Development Department (excluding trade secrets and know how developed by the BPG) that were made available both to BPG and Videoconferencing Products Group and that were assigned to Charger pursuant to the Purchase Agreement.

CONFIDENTIAL

## Exhibit C

## Jointly Owned Patents

U.S. Patent No. 4,302,775
U.S. Patent No. 4,394,774
U.S. Patent No. 4,541,012 and corresponding foreign patents (France Patent No. 0084270; England Patent No. P3271502,8; Canada Patent No. 1209266)
U.S. Patent No. 4,698,672
U.S. Patent No. 4,704,628

CONFIDENTIAL

**EXHIBIT D**

**PATENT ASSIGNMENTS**

CONFIDENTIAL

06/24/98 MON 12:53 FAX 312861220058 84

## PATENT ASSIGNMENT

CONFIDENTI/

THIS PATENT ASSIGNMENT ("Assignment") is made and entered into as of this 24th day of June, 1996, ("Effective Date"), by and between Compression Labs, Incorporated, a Delaware corporation, with its principal office at 2860 Junction Avenue, San Jose, California 95134 ("Assignor"), and Charger Industries, Inc. a California corporation, with its principal office at 6262 Lusk Boulevard, San Diego, California 92121 ("Assignee").

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of June 7, 1996 ("Asset Purchase Agreement"), pursuant to which Assignor has agreed to sell and Assignee has agreed to purchase the assets, properties and rights pertaining to the Business as defined in the Asset Purchase Agreement;

WHEREAS, Assignor is the sole and exclusive owner of the entire right, title and interest in, to and under those United States patents and patent applications identified and set forth on Schedules A and B respectively (the "Patents"); and

WHEREAS, Assignee wishes to acquire and Assignor wishes to assign the entire right, title and interest in and to the Patents.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, assign, transfer and set over to Assignee, the entire right, title and interest in and to the Patents, for the United States and for all foreign countries, including any

GICLI3A.NH
June 24, 1996

- 1 -

/24/96   MON 12:53 FAX 312881220058 84                                    @014

CONFIDENTIAL

continuations, divisions, continuations-in-part, reissues, reexaminations, extensions or foreign equivalents thereof, and including the subject matter of all claims which may be obtained therefrom for its own use and enjoyment, and for the use and enjoyment of its successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment and sale had not been made; together with all income, royalties, damages or payments due or payable as of the Effective Date or thereafter, including, without limitation, all claims for damages by reason of past, present or future infringement or other unauthorized use of the Patents, with the right to sue for, and collect the same for its own use and enjoyment, and for the use and enjoyment of its successors, assigns, or other legal representatives.

Assignor authorizes and requests the Commissioner of Patents and Trademarks to record Assignee as owner of the Patents, including any continuations, divisions, continuations-in-part, reissues, reexaminations or extensions thereof, and to issue any and all letters patent of the United States thereon to Assignee, as assignee of the entire right, title and interest in, to and under the same, for the sole use and enjoyment of Assignee, its successors, assigns or other legal representatives.

Assignor shall provide Assignee, its successors, assigns or other legal representatives, cooperation and assistance at Assignee's request and expense (including the execution and delivery of any and all affidavits, declarations, oaths, exhibits,

GICLI3A.NH
June 24, 1996

- 2 -

CONFIDENTIAL

assignments, powers of attorney or other documentation as may be reasonably required): (1) in the preparation and prosecution of any applications covering the inventions assigned herein; (2) in the prosecution or defense of any interference, opposition, reexamination, reissue, infringement or other proceedings that may arise in connection with any of the patent rights assigned herein, including, but not limited to, testifying as to any facts relating to the patent rights assigned herein and this Assignment; (3) in obtaining any additional patent protection that Assignee may deem appropriate which may be secured under the laws now or hereafter in effect in the United States or any other country; and (4) in the implementation or perfection of this Assignment.

Except with respect to Intellectual Property (as defined in the Asset Purchase Agreement), which are governed by the provisions of the Asset Purchase Agreement, the Patents are provided "AS IS" and without any warranty of any kind, including without limitation warranties of title and non-infringement.

This Assignment shall be construed and governed in accordance with the laws of the State of California without giving effect to laws concerning conflicts of laws.

This Assignment, together with the exhibits attached hereto, comprises the entire, final and exclusive understanding of the parties with respect to the subject matter herein and supersedes any previous agreement, whether oral or written, with respect to such subject matter. Notwithstanding the foregoing, to the extent any provision of this Assignment conflicts with the

GICLI3A.NH
June 24, 1996

4/96  MON 12:55 FAX 312861220058 8'                                    @016

Asset Purchase Agreement or the License and Co-Ownership Agreement
dated June __, 1996 between the parties, with respect to any
provisions applicable to the Marks, the terms of such other
agreements shall prevail.

      *       *       *       *       *       *

CONFIDENTIAL

GICLI3A.NH
June 24, 1996

- 4 -

IN TESTIMONY WHEREOF, the Assignor and Assignee have caused this Assignment to be signed and executed by the undersigned officers thereunto duly authorized this 24 th day of June, 1996.

COMPRESSION LABS, INCORPORATED

Name: THOMAS G. TRIMM.

Title: President, CEO.

CHARGER INDUSTRIES, INC.

Name:  Susan M. Meyer

Title:  Vice President

STATE OF California )
                    ) ss.
COUNTY OF Santa Clara )

On this 24th day of June , 1996 there appeared before me Thomas G. Trimm , personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of Compression Labs, Incorporated

Notary

**SALLY ZUMBA**
Comm. #1005103
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
Comm. Expires Sept. 23, 1997

STATE OF ILLINOIS )
                  ) SS.
COUNTY OF COOK )

On this 24th day of June , 1996, there appeared before me Susan M. Meyer , personally known to me, who acknowledged that she signed the foregoing Assignment as his her voluntary act and deed on behalf and with full authority of Charger Industries, Inc.

"OFFICIAL SEAL"
Loretta M. McKnight
Notary Public, State of Illinois
My Commission Expires 2/9/98

Notary Public

CONFIDENTIAL

GICLI3A.NH
June 24, 1996

- 5 -

## SCHEDULE A

### U.S. PATENTS

| Title | Patent No. | Issue Date |
|---|---|---|
| Discrete Cosine Transformer | 4,385,363 | |
| Method for Configuring a Statistical Multiplexer to Dynamically Allocate Communication Channel Bandwidth | 5,506,844 | |

CONFIDENTIAL

GICLI3A.NH
June 24, 1996

- 6 -

6/24/96  MON 12:56 FAX 312861220058 84                                    @015

## SCHEDULE B

## U.S. PATENT APPLICATIONS

| Title | Serial No. | Filing Date |
|-------|-----------|-------------|
| Detelecine | 08-162511 | |

CONFIDENTIAL

GICLI3A.NH
June 24, 1996

- 7 -

## PATENT ASSIGNMENT

THIS PATENT ASSIGNMENT ("Assignment") is made and entered into as of this 24th day of June, 1996, ("Effective Date"), by and between Compression Labs, Incorporated, a Delaware corporation, with its principal office at 2860 Junction Avenue, San Jose, California 95134 ("Assignor"), and Charger Industries, Inc. a California corporation, with its principal office at 6262 Lusk Boulevard, California 92121 ("Assignee").

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of June 7, 1996 ("Asset Purchase Agreement"), pursuant to which Assignor has agreed to sell and Assignee has agreed to purchase the assets, properties and rights pertaining to the Business as defined in the Asset Purchase Agreement;

WHEREAS, Assignor is the sole and exclusive owner of the entire right, title and interest in, to and under those United States patents identified and set forth on Schedule A and the foreign patents identified and set forth on Schedule B (the "Patents"); and

WHEREAS, Assignee wishes to acquire and Assignor wishes to assign an undivided one-half interest in and to the Patents.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, assign, transfer and set over to Assignee, an

GICLI2A.NH
June 24, 1996

CONFIDENTIAL

undivided one-half interest in and to the Patents, for the United States and for all foreign countries, including any continuations, divisions, continuations-in-part, reissues, reexaminations, extensions or foreign equivalents thereof, and including the subject matter of all claims which may be obtained therefrom for its own use and enjoyment, and for the use and enjoyment of its successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment and sale had not been made.

Assignor authorizes and requests the Commissioner of Patents and Trademarks to record Assignee as a joint owner of the Patents, including any continuations, divisions, continuations-in-part, reissues, reexaminations or extensions thereof, and to issue any and all letters patent of the United States thereon to Assignee, as assignee of an undivided one-half interest in, to and under the same, for the use and enjoyment of Assignee, its successors, assigns or other legal representatives.

Assignor shall provide Assignee, its successors, assigns or other legal representatives, cooperation and assistance at Assignee's request and expense (including the execution and delivery of any and all affidavits, declarations, oaths, exhibits, assignments, powers of attorney or other documentation as may be reasonably required): (1) in the prosecution or defense of any interference, opposition, reexamination, reissue, infringement or

GICLI2A.NH
June 24, 1996

CONFIDENTIAL

- 2 -

06/24/96  MON 12:57 FAX 312861220058 84                                    @022

other proceedings that may arise in connection with any of the patent rights assigned herein, including, but not limited to, testifying as to any facts relating to the patent rights assigned herein and this Assignment; (2) in obtaining any additional patent protection that Assignee may deem appropriate which may be secured under the laws now or hereafter in effect in the United States or any other country; and (3) in the implementation or perfection of this Assignment.

Except with respect to Intellectual Property (as defined in the Asset Purchase Agreement), which are governed by the provisions of the Asset Purchase Agreement, the Patents are provided "AS IS" and without any warranty of any kind, including without limitation warranties of title and non-infringement.

This Assignment shall be construed and governed in accordance with the laws of the State of California without giving effect to laws concerning conflicts of laws.

This Assignment, together with the exhibits attached hereto, comprises the entire, final and exclusive understanding of the parties with respect to the subject matter herein and supersedes any previous agreement, whether oral or written, with respect to such subject matter. Notwithstanding the foregoing, to the extent any provision of this Assignment conflicts with the Asset Purchase Agreement or the License and Co-Ownership Agreement dated June __, 1996 between the parties, with respect to any

GICLI2A.NH
June 24, 1996



CONFIDENTIAL

provisions applicable to the Marks, the terms of such other
agreements shall prevail.

         *       ·       *        *        *        *        *

CONFIDENTIAL

GICLI2A.NH
June 24, 1996

- 4 -

IN TESTIMONY WHEREOF, the Assignor and Assignee have caused this Assignment to be signed and executed by the undersigned officers thereunto duly authorized this 24th day of June, 1996.

COMPRESSION LABS, INCORPORATED

Name: _Thomas G. Treimer._

Title: _President, CEO._

CHARGER INDUSTRIES, INC.

Name: Susan M. Meyer

Title: Vice President

STATE OF California )
                        ) SS.
COUNTY OF Santa Clara )

On this 24th day of June, 1996 there appeared before me Thomas G. Treimer, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of Compression Labs, Incorporated

[Notary Seal: SALLY M. ZUMBA, Comm. #1005103, NOTARY PUBLIC - CALIFORNIA, SANTA CLARA COUNTY, Comm. Expires Sept. 29, 1997]

STATE OF ILLINOIS )
                      ) SS.
COUNTY OF COOK )

On this 24th day of June, 1996, there appeared before me Susan M. Meyer, personally known to me, who acknowledged that she signed the foregoing Assignment as his her voluntary act and deed on behalf and with full authority of Charger Industries, Inc.

"OFFICIAL SEAL"
Loretta M. McKnight
Notary Public, State of Illinois
My Commission Expires 2/9/98

Notary Public

GICLI2A.NH
June 24, 1996

CONFIDENTIAL

- 5 -

06/24/96  MON 12:58 FAX 312861220058 84                                      ⍟025

## SCHEDULE A

## U.S. PATENTS

| Title | Patent No. | Issue Date |
|-------|-----------|------------|
| Digital Video Compression System and Methods Utilizing Scene Adaptive Coding with Rate Buffer Feedback | 4,302,775 | |
| Digital Video Compression System and Methods Utilizing Scene Adaptive Coding with Rate Buffer Feedback | 4,394,774 | |
| Video Bandwidth Reduction System Employing Interframe Block Differencing and Transform Domain Coding | 4,541,012 | |
| Coding Systems for Redundancy Reduction | 4,698,672 | |
| Combined Intraframe and Interframe Transform Coding System | 4,704,628 | |

GICLI2A.NH
June 24, 1996

CONFIDENTIAL

08/24/96  MON 12:59 FAX ...

## SCHEDULE B

### FOREIGN PATENTS

| Title | Country | Patent No. | Issue Date |
|---|---|---|---|
| Video Bandwidth Reduction System Employing Interframe Block Differencing and Transform Domain Coding | FRANCE U.K. CANADA | 0084270 P3271502,8 1209266 | |

CONFIDENTIAL

GICLI2A.NH
June 24, 1996

- 7 -

**EXHIBIT E**

## TRADEMARK ASSIGNMENT

CONFIDENTIAL

06/24/96  SUN 12:48 FAX 312861220058 84                                    ☒002

## TRADEMARK, TRADE NAME AND ASSUMED NAME ASSIGNMENT

THIS TRADEMARK, TRADE NAME AND ASSUMED NAME ASSIGNMENT
(the "Assignment") is made and entered into as of this 24th day of
June, 1996, ("Effective Date"), by and between Compression Labs,
Incorporated, a Delaware corporation, with its principal office at
2860 Junction Avenue, San Jose, California 95134 ("Assignor"), and
Charger Industries, Inc. a California corporation, with its
principal office at 6262 Lusk Boulevard, San Diego, CA 92121
("Assignee").

WHEREAS, Assignor and Assignee are parties to that
certain Asset Purchase Agreement dated as of June 7, 1996 ("Asset
Purchase Agreement"), pursuant to which Assignor has agreed to sell
and Assignee has agreed to purchase the assets, properties and
rights pertaining to the Business as defined in the Asset Purchase
Agreement;

WHEREAS, Assignor is the sole and exclusive owner of the
entire right, title and interest in, to and under the trademarks
and the United States trademark registrations and applications for
registration identified and set forth on Schedules A and B,
respectively, including variations thereof, and the unregistered
trademarks identified and set forth on Schedule C, and any
variation thereof, and the foreign trademark registrations and
applications for registrations identified and set forth on
Schedule D (collectively, the "Marks"), and various trade names and
assumed names, identified and set forth on Schedules E and F,
respectively, including variations thereof (collectively, the

GICLI4A.NH
June 24, 1996

- 1 -



'24/96  MON 12:49 FAX 312861220058 54                                    ☒003

"Trade/Assumed Names"), and the goodwill of the business associated therewith;

WHEREAS, Assignee wishes to acquire and Assignor wishes to assign all right, title and interest in and to the Marks and the Trade/Assumed Names together with the goodwill of the business in connection with which the Marks and the Trade/Assumed Names are used;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, assign, transfer and set over to Assignee the entire right, title and interest in and to the Marks and the Trade/Assumed Names together with the goodwill of the business in connection with which the Marks and the Trade/Assumed Names are used, and all registrations and applications therefor, in the United States and for all foreign countries, including any renewals and extensions of the registrations that are or may be secured under the laws of the United States and all foreign countries, now or hereafter in effect, for Assignee's own use and enjoyment, and for the use and enjoyment of Assignee's successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by the Assignor if this Assignment and sale had not been made; together with all income, royalties or payments due or payable as of the Effective Date or thereafter, including, without limitation, all claims for damages by reason of past, present or future infringement or other unauthorized use of the Marks and the Trade/Assumed Names, with the right to sue for,

GICLI4A.NH
June 24, 1996

CONFIDENTIAL

- 2 -

06/24/96   MON 12:50 FAX 312661220058 84                                         004

and collect the same for Assignee's own use and enjoyment and for
the use and enjoyment of its successors, assigns or other legal
representatives.  Assignor requests the Commissioner of Patents and
Trademarks to record Assignee as the assignee and owner thereof.

Assignor shall provide to Assignee, its successors,
assigns or other legal representatives, reasonable cooperation and
reasonable assistance at Assignee's request and expense (including
the execution and delivery of any and all affidavits, declarations,
oaths, samples, exhibits, specimens and other documentation as may
be reasonably required): (1) in the preparation and prosecution of
any application for registration or any application for renewal of
a registration covering any of the Marks or the Trade/Assumed
Names; (2) in the prosecution or defense of any interference,
opposition, infringement or other proceedings that may arise in
connection with any of the Marks or the Trade/Assumed Names,
including, but not limited to, testifying as to any facts relating
to the Marks and Trade/Assumed Names assigned herein and this
Assignment; (3) in obtaining any additional trademark protection
for the Marks or any of the Trade/Assumed Names that Assignee
reasonably may deem appropriate that may be secured under the laws
now or hereafter in effect in the United States or for all foreign
countries; and (4) in the implementation or perfection of this
Assignment.

Except with respect to Intellectual Property (as defined
in the Asset Purchase Agreement), which are governed by the
provisions of the Asset Purchase Agreement, the Marks are provided

GICLI4A.NH
June 24, 1996

- 3 -                        CONFIDENTIAL

"AS IS" and without any warranty of any kind, including without
limitation warranties of title and non-infringement.

This Assignment shall be construed and governed in
accordance with the laws of the State of California without giving
effect to laws concerning conflicts of laws.

This Assignment, together with the exhibits attached
hereto, comprises the entire, final and exclusive understanding of
the parties with respect to the subject matter herein and
supersedes any previous agreement, whether oral or written, with
respect to such subject matter. Notwithstanding the foregoing, to
the extent any provision of this Assignment conflicts with the
Asset Purchase Agreement or the License and Co-Ownership Agreement
dated June __, 1996 between the parties, with respect to any
provisions applicable to the Marks, the terms of such other
agreements shall prevail.

*     *     *     *     *

GICLI4A.NH
June 24, 1996

CONFIDENTIAL

- 4 -

IN TESTIMONY WHEREOF, the Assignor and Assignee have caused this Assignment to be signed and executed by the undersigned officers thereunto duly authorized this 24th day of June, 1996.

COMPRESSION LABS, INCORPORATED

Name: _Thomas G. Trimm._

Title: _President, CEO._

CHARGER INDUSTRIES, INC.

Name: Susan M. Meyer

Title: Vice President

STATE OF California )
                    ) SS.
COUNTY OF Santa Clara )

On this 24th day of June, 1996 there appeared before me Thomas G. Trimm, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of Compression Labs, Incorporated

Notary Public

SALLY ZUMBA
Comm. #1005103
NOTARY PUBLIC - CALIFORNIA
SANTA CLARA COUNTY
Comm. Expires Sept. 25, 1997

STATE OF ILLINOIS  )
                   ) SS.
COUNTY OF COOK     )

On this 24th day of June, 1996, there appeared before me Susan M. Meyer, personally known to me, who acknowledged that she signed the foregoing Assignment as his her voluntary act and deed on behalf and with full authority of Charger Industries, Inc.

"OFFICIAL SEAL"
Loretta M. McKnight
Notary Public, State of Illinois
My Commission Expires 2/9/98

Notary Public

GICLI4A.NH
June 24, 1996

- 5 -

06/24/96  MON 12:51 FAX 312861220058 84

## SCHEDULE A

### U.S. TRADEMARK REGISTRATIONS

| Mark | Reg. No. | Reg. Date |
|------|----------|-----------|
| MAGNITUDE | 1,956,383 | |

GICLI4A.NH
June 24, 1996

CONFIDENTIAL

06/24/96  MON 12:51 FAX 312861220058 84                                    ☒008

## SCHEDULE B

## U.S. TRADEMARK APPLICATIONS

| Mark | Serial No. | Filing Date |
|------|-----------|-------------|
| STATMUX | 75/054589 | |

CONFIDENTIAL

GICLI4A.NH
June 24, 1996

- 7 -

## SCHEDULE C

### UNREGISTERED TRADEMARKS

Mark

MovieMaster

Sea Tv

CONFIDENTIAL

GICLI4A.NH
June 24, 1996

- 8 -

## SCHEDULE D

### FOREIGN TRADEMARKS

| Mark | Country | Reg. No. | Reg. Date |
|------|---------|----------|-----------|
| NONE | | | |

### FOREIGN TRADEMARK APPLICATIONS

| Mark | Country | Serial No. | Reg. Date |
|------|---------|------------|-----------|
| NONE | | | |

CONFIDENTIAL

GICLI4A.NH
June 24, 1996

- 9 -

☒011

## SCHEDULE E

## TRADE NAMES

NONE

CONFIDENTIAL

GICLI4A.NH
June 24, 1996

- 10 -

Compression Labs, Inc. v. Dell Inc., et al.
Civ. A. No. 2:04-CV-159-TJW (Judge Ward)

# EXHIBIT C
# TO THE DECLARATION OF
# ERIC M. ALBRITTON

07-15-1996                    581/125

FORM PTO-1595
(Rev. 6-93)
OMB No. 0651-0011 (exp. 4/94)                                    U.S. DEPARTMENT OF COMMERCE
‖‖‖‖‖‖‖‖‖ 100232319    RECEIVED    Patent and Trademark Office

Tab settings ⇨ ⇨ ▼                    JUL 10 1996

To the Honorable Commissioner of Patents and Trademarks: Please record the attached original documents or copy thereof.

MRD 7-10-96

| 1. Name of conveying party(ies): | 2. Name and address of receiving party(ies) |
|---|---|
| Compression Labs, Incorporated<br>2860 Junction Avenue<br>San Jose, California  95134 | Name: Charger Industries, Inc.<br><br>Internal Address: |
| Additional name(s) of conveying party(ies) attached? ☐ Yes ☒ No | |

3. Nature of conveyance:

☐ Assignment          ☐ Merger

☐ Security Agreement  ☐ Change of Name

☒ Other  Assignment of one-half interest

Execution Date:  June 24, 1996

Street Address:  6262 Lusk Boulevard

City:  San Diego   State:  CA   ZIP:  92121

Additional name(s) & address(es) attached? ☐ Yes ☒ No

4. Application number(s) or patent number(s):

If this document is being filed together with a new application, the execution date of the application is:_____

A. Patent Application No.(s)

B. Patent No.(s)
4302775    4541012
4394774    4698672
           4704628

Additional numbers attached? ☐ Yes ☒ No

| 5. Name and address of party to whom correspondence concerning document should be mailed: | 6. Total number of applications and patents involved: [ 5 ] |
|---|---|
| Name:  Neil S. Hirshman, Esq. | 7. Total fee (37 CFR 3.41)..........$125.00 |
| Internal Address:  Kirkland & Ellis | ☒ Enclosed<br>☒ Authorized to be charged to deposit account  any deficiencies<br>credit any overpayment |
| Street Address:  200 East Randolph Drive<br>Suite 6100 | 8. Deposit account number:<br>22-0440 |
| City: Chicago  State: IL  ZIP: 60601 | (Attach duplicate copy of this page if paying by deposit account) |

DO NOT USE THIS SPACE

9. Statement and signature.
To the best of my knowledge and belief, the foregoing information is true and correct and any attached copy is a true copy of the original document.

Neil S. Hirshman                    [signature]                    July 9, 1996
Name of Person Signing               Signature                      Date

Total number of pages including cover sheet, attachments, and document:  [ 3 ]

Mail documents to be recorded with required cover sheet information to:
Commissioner of Patents & Trademarks, Box Assignments
Washington, D.C. 20231

·· ᴸᴼ·ᵁⁱ FAX 312861220056 64

## PATENT ASSIGNMENT

THIS PATENT ASSIGNMENT ("Assignment") is made and entered into as of this 24th day of June, 1996, ("Effective Date"), by and between Compression Labs, Incorporated, a Delaware corporation, with its principal office at 2860 Junction Avenue, San Jose, California 95134 ("Assignor"), and Charger Industries, Inc. a California corporation, with its principal office at 6262 Lusk Boulevard, San Diego, California 92121 ("Assignee").

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of June 7, 1996 ("Asset Purchase Agreement"), pursuant to which Assignor has agreed to sell and Assignee has agreed to purchase the assets, properties and rights pertaining to the Business as defined in the Asset Purchase Agreement;

WHEREAS, Assignor is the sole and exclusive owner of the entire right, title and interest in, to and under those United States patents identified and set forth on Schedule A and the foreign patents identified and set forth on Schedule B (the "Patents"); and

WHEREAS, Assignee wishes to acquire and Assignor wishes to assign an undivided one-half interest in and to the Patents.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor does hereby sell, assign, transfer and set over to Assignee, an

GICLI2A.NH
June 24, 1996

06/24/96  MON 13:07 FAX 312861220058  84                                    ☒021

undivided one-half interest in and to the Patents, for the United States and for all foreign countries, including any continuations, divisions, continuations-in-part, reissues, reexaminations, extensions or foreign equivalents thereof, and including the subject matter of all claims which may be obtained therefrom for its own use and enjoyment, and for the use and enjoyment of its successors, assigns or other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment and sale had not been made.

Assignor authorizes and requests the Commissioner of Patents and Trademarks to record Assignee as a joint owner of the Patents, including any continuations, divisions, continuations-in-part, reissues, reexaminations or extensions thereof, and to issue any and all letters patent of the United States thereon to Assignee, as assignee of an undivided one-half interest in, to and under the same, for the use and enjoyment of Assignee, its successors, assigns or other legal representatives.

Assignor shall provide Assignee, its successors, assigns or other legal representatives, cooperation and assistance at Assignee's request and expense (including the execution and delivery of any and all affidavits, declarations, oaths, exhibits, assignments, powers of attorney or other documentation as may be reasonably required): (1) in the prosecution or defense of any interference, opposition, reexamination, reissue, infringement or

GICLI2A.NH
June 24, 1996

- 2 -

PATENT
REEL: 8022 FRAME: 0835

06/24/96  MON 13:03 FAX 312881220059 84

other proceedings that may arise in connection with any of the patent rights assigned herein, including, but not limited to, testifying as to any facts relating to the patent rights assigned herein and this Assignment; (2) in obtaining any additional patent protection that Assignee may deem appropriate which may be secured under the laws now or hereafter in effect in the United States or any other country; and (3) in the implementation or perfection of this Assignment.

Except with respect to Intellectual Property (as defined in the Asset Purchase Agreement), which are governed by the provisions of the Asset Purchase Agreement, the Patents are provided "AS IS" and without any warranty of any kind, including without limitation warranties of title and non-infringement.

This Assignment shall be construed and governed in accordance with the laws of the State of California without giving effect to laws concerning conflicts of laws.

This Assignment, together with the exhibits attached hereto, comprises the entire, final and exclusive understanding of the parties with respect to the subject matter herein and supersedes any previous agreement, whether oral or written, with respect to such subject matter. Notwithstanding the foregoing, to the extent any provision of this Assignment conflicts with the Asset Purchase Agreement or the License and Co-Ownership Agreement dated June __, 1996 between the parties, with respect to any

GICLI2A.NH
June 24, 1996

- 3 -

06/24/96  MON 13:09 FAX 312801220058  84                          ☒023

provisions applicable to the Marks, the terms of such other
agreements shall prevail.

          *        *        *        *        *        *

GICLI2A.NH
June 24, 1996

- 4 -

IN TESTIMONY WHEREOF, the Assignor and Assignee have caused this Assignment to be signed and executed by the undersigned officers thereunto duly authorized this 24th day of June, 1996.

COMPRESSION LABS, INCORPORATED

Name: _Thomas G. Trinne_

Title: _President, CEO._

CHARGER INDUSTRIES, INC.

Name: __Susan M. Meyer__

Title: __Vice President__

STATE OF _California_ )
                        ) SS.
COUNTY OF _Santa Clara_ )

On this _24th_ day of _June_ , 1996 there appeared before me _Thomas G. Trinne_ , personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of _Compression Labs, Incorporated_

SALLY ZUMBA
Comm. #1005103
NOTARY PUBLIC · CALIFORNIA
SANTA CLARA COUNTY
Comm. Expires Sept. 29, 1997

STATE OF ILLINOIS  )
                   ) SS.
COUNTY OF COOK     )

On this _24th_ day of _June_ , 1996, there appeared before me _Susan M. Meyer_ , personally known to me, who acknowledged that she signed the foregoing Assignment as his her voluntary act and deed on behalf and with full authority of _Charger Industries, Inc._ .

"OFFICIAL SEAL"
Loretta M. McKnight
Notary Public, State of Illinois
My Commission Expires 2/9/98

_____
Notary Public

GICLI2A.NH
June 24, 1996

- 5 -

PATENT
REEL: 8022 FRAME: 0838

☑025

06/24/96  MON 13:09 FAX 312861220058  84

## SCHEDULE A

### U.S. PATENTS

| Title | Patent No. | Issue Date |
|---|---|---|
| Digital Video Compression System and Methods Utilizing Scene Adapative Coding with Rate Buffer Feedback | 4,302,775 | |
| Digital Video Compression System and Methods Utilizing Scene Adapative Coding with Rate Buffer Feedback | 4,394,774 | |
| Video Bandwidth Reduction System Employing Interframe Block Differencing and Transform Domain Coding | 4,541,012 | |
| Coding Systems for Redundancy Reduction | 4,698,672 | |
| Combined Intraframe and Interframe Transform Coding System | 4,704,628 | |

GICLI2A.NH
June 24, 1996

- 6 -

06/24/96  MON 13:09 FAX 312861220058 84                                    @026

## SCHEDULE B

### FOREIGN PATENTS

| Title | Country | Patent No. | Issue Date |
|-------|---------|-----------|-----------|
| Video Bandwidth Reduction System Employing Interframe Block Differencing and Transform Domain Coding | FRANCE<br>U.K.<br>CANADA | 0084270<br>P3271502,8<br>1209266 | |

GICLI2A.NH
June 24, 1996

- 7 -

PATENT
REEL: 8022 FRAME: 0840

# KIRKLAND & ELLIS

PARTNERSHIPS INCLUDING PROFESSIONAL CORPORATIONS

200 East Randolph Drive
Chicago, Illinois 60601

312 861-2000

Facsimile:
312 861-2200

Neil S. Hirshman
To Call Writer Direct
312 861-2493

July 9, 1996

**VIA EXPRESS MAIL**

Commissioner of Patents
  and Trademarks
Washington, D.C. 20231
Attention: Box Assignments

Re:    Request for Recordation of Assignment
       Our Ref. No.: 33756-0012-3

Dear Sir:

Enclosed is a Patent Assignment assigning one-half interest of the patents from Compression Labs, Incorporated (a Delaware corporation) in favor of Charger Industries, Inc. (a California corporation) dated as of June 24, 1996.

It is respectfully requested that the enclosed document be recorded on the Patent and Trademark Office assignment records for the United States patents that are identified on Schedule A.

Also enclosed are the Patent Recordation Form Cover Sheet and our check in the amount of $125.00 in payment of the required recording fee. Any additional charges should be applied to Office Deposit Account No. 22-0440.

Please forward any correspondence and the original recorded document to my attention.

Very truly yours,

Neil S. Hirshman

Enclosures

London                    Los Angeles                    New York    PATENT    Washington D.C.

REEL: 8022 FRAME: 0841

## EXPRESS MAIL CERTIFICATE

Express Mail No.:  TB822410072

Date of Deposit:  July 9, 1996

I hereby certify that the following documents are being deposited with the United States Postal Service as express mail under 37 CFR 1.10 on the date indicated above and is addressed to: Commissioner of Patents and Trademarks, Washington, D.C. 20231, Attention: Box Assignments.

Transmittal Letter, Recordation Form Cover Sheet for Trademarks (1 page); Patent Assignment document (assigning one-half interest) (7 pages); Check in the amount of $125.00 for filing fees; and an Express Mail Certificate for mailing (1 page).

Kara L. Bradford
(Type or printed name of person mailing paper or fee)

*Kara Bradford*
(Signature of person mailing paper or fee)

PATENT
REEL: 8022 FRAME: 0842

RECORDED: 07/10/1996

<u>Compression Labs, Inc. v. Dell Inc., et al.</u>
Civ. A. No. 2:04-CV-159-TJW (Judge Ward)

# EXHIBIT D
# TO THE DECLARATION OF
# ERIC M. ALBRITTON

USPTO Assignments on the Web

http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&...



**United States Patent and Trademark Office**

Home | Site Index | Search | Guides | Contacts | eBusiness | eBiz alerts | News | Help



Assignments on the Web > **Patent Query**

# Patent Assignment Abstract of Title

**_NOTE:Results display only for issued patents and published applications. For pending or abandoned applications please consult USPTO staff._**

**Total Assignments: 5**
**Patent #:** 4698672    **Issue Dt:** 10/06/1987    **Application #:** 06923630    **Filing Dt:** 10/27/1986
**Inventors:** WEN-HSIUNG CHEN, DANIEL J. KLENKE
**Title:** CODING SYSTEM FOR REDUCING REDUNDANCY

**Assignment: 1**    **Pages:** 3
**Reel/Frame:** 004644/0670    **Recorded:** 10/27/1986
**Conveyance:** ASSIGNMENT OF ASSIGNORS INTEREST.
**Assignors:** CHEN, WEN-HSIUNG    **Exec Dt:** 10/23/1986
KLENKE, DANIEL J.    **Exec Dt:** 10/23/1986
**Assignee:** COMPRESSION LABS, INC., 2305 BERING DRIVE, SAN JOSE, CA, A CORP OF CA
**Correspondent:** DAVID E. LOVEJOY
FLIESLER, DUBB, MEYER & LOVEJOY
STE. 1740, FOUR EMBARCADERO CTR.
SAN FRANCISCO, CA 94111-4187

**Assignment: 2**    **Pages:** 25
**Reel/Frame:** 007038/0811    **Recorded:** 07/05/1994
**Conveyance:** SECURITY INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** COMPRESSION LABS, INCORPORATED    **Exec Dt:** 06/30/1994
**Assignee:** BANK OF AMERICA NT&SA
555 CALIFORNIA STREET, 8TH FLOOR, LEGAL DEPT. #3017, SAN FRANCISCO, CA 94104
**Correspondent:** DEBORAH DEMACK
FEDERAL RESEARCH CORP
601 PENNSYLVANIA AVE. N.W.
NORTH BUILDING, #612
WASHINGTON, DC 20004

**Assignment: 3**    **Pages:** 40
**Reel/Frame:** 007097/0913    **Recorded:** 08/16/1994
**Conveyance:** SECURITY INTEREST (SEE DOCUMENT FOR DETAILS).
**Assignor:** COMPRESSION LABS, INCORPORATED    **Exec Dt:** 06/30/1994
**Assignee:** BANK OF AMERICA NT&SA
555 CALIFORNIA STREET, 8TH FLR., LEGAL DEPT. #3017 SAN FRANCISCO, CA 94104
**Correspondent:** DEBORAH M. DEMACK
FEDERAL RESEARCH CORP.
601 PENNSYLVANIA AVE. NW
NORTH BUILDING, #612
WASHINGTON, DC 20004

**Assignment: 4**

7/1/2004 4:19 PM

USPTO Assignments on the Web

http://assignments.uspto.gov/assignments/q?db=pat&qt=pat&reel=&...

**Reel/Frame:** <u>008022/0833</u>     **Recorded:** 07/10/1996     **Pages:** 10

**Conveyance:** ASSIGNMENT OF ONE-HALF INTEREST

**Assignor:** <u>COMPRESSION LABS, INCORPORATED</u>     **Exec Dt:** 06/24/1996

**Assignee:** <u>CHARGER INDUSTRIES, INC.</u>
6262 LUSK BOULEVARD
SAN DIEGO, CALIFORNIA 92121

**Correspondent:** KIRKLAND & ELLIS
NEIL S. HIRSHMAN, ESQ.
200 EAST RANDOLPH DRIVE
SUITE 6100
CHICAGO, IL 60601

**Assignment: 5**

**Reel/Frame:** <u>008031/0928</u>     **Recorded:** 07/12/1996     **Pages:** 6

**Conveyance:** CHANGE OF NAME (SEE DOCUMENT FOR DETAILS).

**Assignor:** <u>CHARGER INDUSTRIES, INC.</u>     **Exec Dt:** 06/25/1996

**Assignee:** <u>MAGNITUDE COMPRESSION SYSTEMS, INC.</u>
6262 LUSK BOULEVARD
SAN DIEGO, CALIFORNIA 92121

**Correspondent:** KIRKLAND & ELLIS
NEIL S. HIRSHMAN, ESQ.
200 EAST RANDOLPH DRIVE
SUITE 6100
CHICAGO, IL 60601

Search Results as of: 07/01/2004 04:13 PM

If you have any comments or questions concerning the data displayed, contact OPR / Assignments at 703-308-9723

| .HOME | INDEX| SEARCH | eBUSINESS | CONTACT US | PRIVACY STATEMENT

7/1/2004 4:19 PI

Compression Labs, Inc. v. Dell Inc., et al.
Civ. A. No. 2:04-CV-159-TJW (Judge Ward)

# EXHIBIT E
# TO THE DECLARATION OF
# ERIC M. ALBRITTON

General Instrument Corporation - Historical Record - Business Boneyard                    Page 1 of 4



**The Business Information Authority™**

**Welcome lcordes@cravath.com!**
**Pro Plus Subscriber**

IPO Central        Hoover's Books

Friday, July 2, 2004        Home    About Hoover's    Upgrade Options    Your Account    Help    Log Out

| Company Name ▾ |
|---|
| general instruments |

**Search**
Browse Directories »

**Browse Company Record**
▪ Fact Sheet
  People
  Products/Operations
  Competitors
  SEC Filings

**Pro Premium Tools**
🔳 Build Company List
(D&B In-Depth)

**Pro Plus Tools**
📄 Report Builder
🔳 Build Company List
(D&B Basic)
🌐 International Search

**Pro Tools**
🔳 Build Company List
(Hoover's In-Depth)
👤 Build Executive List
📰 Custom News Search
🎯 Target IPO Companies
📊 StockScreener

**Tools**
📄 Search For Reports
📶 Wireless Access
🖨 Print This Page

# н **General Instrument Corporation**
*This record provides a historical snapshot of the company as it appeared before Hoover's discontinued active coverage.*

## Key Numbers

| | |
|---|---|
| Fiscal Year-End | December |
| **1998 Sales (mil.)** | $1,987.8 |
| **1998 Net Income (mil.)** | $55.5 |
| **1998 Employees** | 7,800 |

## History

Prior to its acquisition by Motorola, General Instrument (GI) made products that let video, voice, data, and audio be delivered over cable, digital satellite, and telephony networks. Products included set-top boxes for consumers (it was the #1 supplier), network transmission equipment for cable operators, and satellite systems. GI also provided fast-performance communications technology to local telephone companies through its majority-owned subsidiary Next Level Communications. Formerly based in Horsham, Pennsylvania, General Instrument's last reported sales were approximately $2 billion in fiscal 1998.

GI was founded in New York in 1923 by Abraham Blumenkrantz, an Austrian orphan who, at age 15, came to New York where his brother was a machine shop foreman. Blumenkrantz landed a job sweeping floors for $4 a week. He became a US citizen that year, at age 25, and started his own machine shop to manufacture the variable condensers that let radios tune into stations. The company, which became GI, was soon also making earphone jacks and tube sockets. It went public in 1939.

During WWII GI (sometimes called "Genius Incorporated" for its amazing innovations) supplied parts for bombs. In the 1940s it added phonograph record changers and television components to its growing product line. Over the next decade it would add more than a thousand items, including its first end product, a converter box for the recently introduced UHF (ultrahigh-frequency) TV channels. Blumenkrantz retired in 1955 but remained chairman of GI's finance committee. He died in 1961.



**Hoover's Online**

General Instrument Corporation - Historical Record - Business Boneyard                    Page 2 of 4



In 1967 GI entered the cable TV industry with its purchase of Jerrold Communications, a supplier of cable TV equipment. That year the company also bought American Totalisator, the world's top maker of pari-mutuel betting machines.

During the early 1970s GI acquired a collection of electronics firms, then began selling noncore assets to encourage its two most successful segments, cable TV and gaming. By the late 1970s GI was making a large portion of North America's betting and lottery machines.

Acquisitions in the 1980s included cable TV converter specialist Tocom (1983) and the TV equipment operations of M/A-COM (1986), including its industry-standard VideoCipher encryption system.

GI was bought in 1990 in an LBO by Forstmann Little & Co., which took the company public again in 1992. The following year Jerrold Communications and the VideoCipher operations were joined to create the company's GI Communications division. Cable and telecommunications equipment contracts boosted international sales, and in 1995 GI acquired Next Level Communications, a maker of digital telephone equipment; a related charge lowered earnings for the year. That year president and COO Richard Friedland was named CEO.

As a benefit to shareholders, Friedland in 1997 split GI into three separately traded companies: CommScope (TV cable), General Semiconductor (power semiconductors), and NextLevel Systems (network systems). Purchases that year boosted NextLevel's skills in network management, TV Internet access, and individualized TV programming. But a restructuring to streamline operations hurt 1997 earnings and led to Friedland's resignation; he was replaced by longtime executive Edward Breen.

A dozen cable companies placed a $4.5 billion order for NextLevel to make 15 million set-top boxes that year (AT&T ordered more than 6 million). As part of that deal, in 1998 the company made a separate pact with seasoned partner TCI (now owned by AT&T) and Sony to make and distribute the boxes. That year NextLevel Systems reclaimed the well-known GI name.

In 1999 Forstmann Little sold most of its remaining stake in GI, including a hefty amount of shares to Liberty Media Group (an AT&T subsidiary that was spun off in 2001). GI that year sold a stake in Next Level Communications (by then a major R&D drain) to the public. Also that year GI agreed to be acquired by communications and electronics giant Motorola.

In January 2000 Motorola and GI finalized the acquisition in a deal

General Instrument Corporation - Historical Record - Business Boneyard                Page 3 of 4

valued at about $17 billion; Motorola also retained GI's interest in
Next Level Communications.

## Location

101 Tournament Dr.
Horsham, PA 19044 (Map)

Phone: 215-323-1000
Fax: 215-443-9454
Toll Free: 800-523-6678

## Key People

**Chairman and CEO**                   Edward D. (Ed) Breen Jr.

**SVP, Finance and CFO**               Eric M. Pillmore
**More People**

## Top Competitors

- ADC Telecommunications
- Alcatel
- Scientific-Atlanta

**Full Competitor List**



**Trading Toolbox**

Why Ameritrade?
Trade Here        Trade Here

Schwab Trader CT
▸Find out more
Trade Here

---

**Related Products From Our Trusted Partners**

• Buy A D&B Report For General
D&B Instrument ⏎

**Report Search**

[                    ] Search

**Additional 3rd Party Libraries**

**New Hoover's
Industry Digests!**

Become an
industry
expert with a
Hoover's
Industry
Digest. A Hoover's
Digest combines
industry analysis
provided by our
expert editors with in-
depth coverage of five
key players in each
industry.

Learn More

**Build Lead Lists**

Use
Hoover's
Lead Finder

General Instrument Corporation - Historical Record - Business Boneyard                    Page 4 of 4

Lead Finder

to create
prospect and contact
lists.

⊕ Indicates external site content that will open in a new browser window.

**Hoover's Online** | **IPO Central** | **Hoover's Books**
Upgrade Options | Newsletters | Hoover's Wireless | Help | Feedback

Copyright © 2004, Hoover's, Inc., ALL RIGHTS RESERVED
About Hoover's | Job Opportunities | Privacy Policy | Advertising Info

Compression Labs, Inc. v. Dell Inc., et al.
Civ. A. No. 2:04-CV-159-TJW (Judge Ward)


# EXHIBIT E
# TO THE DECLARATION OF
# ERIC M. ALBRITTON

General Instrument Corporation - Historical Record - Business Boneyard                 Page 1 of 4

 **The Business Information Authority℠**

**Welcome lcordes@cravath.com!**
Pro Plus Subscriber

IPO Central     Hoover's Books

Friday, July 2, 2004

Home     About Hoover's     Upgrade Options     Your Account     Help     Log Out

| Company Name | |
|---|---|
| general instruments | |
| **Search** | |
| Browse Directories » | |

**Browse Company Record**

▮ **Fact Sheet**
  People
  Products/Operations
  Competitors
  SEC Filings

**Pro Premium Tools**
🎛 Build Company List
  (D&B In-Depth)

**Pro Plus Tools**
📝 Report Builder
🎛 Build Company List
  (D&B Basic)
🌐 International Search

**Pro Tools**
🎛 Build Company List
  (Hoover's In-Depth)
👤 Build Executive List
📰 Custom News Search
🎯 Target IPO Companies
📊 StockScreener

**Tools**
📄 Search For Reports
📶 Wireless Access
🖨 Print This Page

# ℍ **General Instrument Corporation**

*This record provides a historical snapshot of the company as it appeared before Hoover's discontinued active coverage.*

## Key Numbers

| Fiscal Year-End | December |
|---|---|
| **1998 Sales (mil.)** | $1,987.8 |
| **1998 Net Income (mil.)** | $55.5 |
| **1998 Employees** | 7,800 |

## History

Prior to its acquisition by Motorola, General Instrument (GI) made products that let video, voice, data, and audio be delivered over cable, digital satellite, and telephony networks. Products included set-top boxes for consumers (it was the #1 supplier), network transmission equipment for cable operators, and satellite systems. GI also provided fast-performance communications technology to local telephone companies through its majority-owned subsidiary Next Level Communications. Formerly based in Horsham, Pennsylvania, General Instrument's last reported sales were approximately $2 billion in fiscal 1998.

GI was founded in New York in 1923 by Abraham Blumenkrantz, an Austrian orphan who, at age 15, came to New York where his brother was a machine shop foreman. Blumenkrantz landed a job sweeping floors for $4 a week. He became a US citizen that year, at age 25, and started his own machine shop to manufacture the variable condensers that let radios tune into stations. The company, which became GI, was soon also making earphone jacks and tube sockets. It went public in 1939.

During WWII GI (sometimes called "Genius Incorporated" for its amazing innovations) supplied parts for bombs. In the 1940s it added phonograph record changers and television components to its growing product line. Over the next decade it would add more than a thousand items, including its first end product, a converter box for the recently introduced UHF (ultrahigh-frequency) TV channels. Blumenkrantz retired in 1955 but remained chairman of GI's finance committee. He died in 1961.

 Hoover's Online

General Instrument Corporation - Historical Record - Business Boneyard          Page 2 of 4



In 1967 GI entered the cable TV industry with its purchase of Jerrold Communications, a supplier of cable TV equipment. That year the company also bought American Totalisator, the world's top maker of pari-mutuel betting machines.

During the early 1970s GI acquired a collection of electronics firms, then began selling noncore assets to encourage its two most successful segments, cable TV and gaming. By the late 1970s GI was making a large portion of North America's betting and lottery machines.

Acquisitions in the 1980s included cable TV converter specialist Tocom (1983) and the TV equipment operations of M/A-COM (1986), including its industry-standard VideoCipher encryption system.

GI was bought in 1990 in an LBO by Forstmann Little & Co., which took the company public again in 1992. The following year Jerrold Communications and the VideoCipher operations were joined to create the company's GI Communications division. Cable and telecommunications equipment contracts boosted international sales, and in 1995 GI acquired Next Level Communications, a maker of digital telephone equipment; a related charge lowered earnings for the year. That year president and COO Richard Friedland was named CEO.

As a benefit to shareholders, Friedland in 1997 split GI into three separately traded companies: CommScope (TV cable), General Semiconductor (power semiconductors), and NextLevel Systems (network systems). Purchases that year boosted NextLevel's skills in network management, TV Internet access, and individualized TV programming. But a restructuring to streamline operations hurt 1997 earnings and led to Friedland's resignation; he was replaced by longtime executive Edward Breen.

A dozen cable companies placed a $4.5 billion order for NextLevel to make 15 million set-top boxes that year (AT&T ordered more than 6 million). As part of that deal, in 1998 the company made a separate pact with seasoned partner TCI (now owned by AT&T) and Sony to make and distribute the boxes. That year NextLevel Systems reclaimed the well-known GI name.

In 1999 Forstmann Little sold most of its remaining stake in GI, including a hefty amount of shares to Liberty Media Group (an AT&T subsidiary that was spun off in 2001). GI that year sold a stake in Next Level Communications (by then a major R&D drain) to the public. Also that year GI agreed to be acquired by communications and electronics giant Motorola.

In January 2000 Motorola and GI finalized the acquisition in a deal

General Instrument Corporation - Historical Record - Business Boneyard                    Page 3 of 4

valued at about $17 billion; Motorola also retained GI's interest in
Next Level Communications.

## Location

101 Tournament Dr.                          Phone: 215-323-1000
Horsham, PA 19044 (Map)                     Fax: 215-443-9454
                                            Toll Free: 800-523-6678

## Key People

**Chairman and CEO**                        Edward D. (Ed) Breen Jr.

**SVP, Finance and CFO**                    Eric M. Pillmore
**More People**

## Top Competitors

- ADC Telecommunications
- Alcatel
- Scientific-Atlanta

**Full Competitor List**



**Trading Toolbox**

| Why Ameritrade? | | Schwab Trader CT ▸Find out more |
| Trade Here | Trade Here | Trade Here |

---

**Related Products From Our Trusted Partners**

D&B  ● Buy A D&B Report For General Instrument ᴳ⁺

**Report Search**

[_____]  Search

**Additional 3rd Party Libraries**

**New Hoover's Industry Digests!**

Become an industry expert with a Hoover's Industry Digest. A Hoover's Digest combines industry analysis provided by our expert editors with in-depth coverage of five key players in each industry.

Learn More

**Build Lead Lists**

Use Hoover's Lead Finder

General Instrument Corporation - Historical Record - Business Boneyard

Lead Finder

to create
prospect and contact
lists.

---

⊕ Indicates external site content that will open in a new browser window.

**Hoover's Online** | **IPO Central** | **Hoover's Books**
Upgrade Options | Newsletters | Hoover's Wireless | Help | Feedback

**Copyright © 2004, Hoover's, Inc., ALL RIGHTS RESERVED**
About Hoover's | Job Opportunities | Privacy Policy | Advertising Info