<u>Compression Labs, Inc. v. Dell Inc., et al.</u>
Civ. A. No. 2:04-CV-159-TJW (Judge Ward)

# EXHIBIT F
# TO THE DECLARATION OF
# ERIC M. ALBRITTON

Dockets.Justia.com

ORIGINAL

## AMENDMENT TO LICENSE AND CO-OWNERSHIP AGREEMENT

THIS AMENDMENT TO LICENSE AND CO-OWNERSHIP AGREEMENT (this "Amendment") effective as of July 1, 1997, is entered into between COMPRESSION LABS, INC., a Delaware corporation ("CLI"), and MAGNITUDE COMPRESSION SYSTEMS, INC., a California corporation ("Magnitude").

WHEREAS, CLI, and Charger Industries, Inc., have entered into that certain License and Co-Ownership Agreement as of June 24, 1996 (the "License Agreement").

WHEREAS, Charger Industries, Inc., has been renamed to "Magnitude Compression Systems, Inc."

WHEREAS, CLI and Magnitude would like to amend the License Agreement to enable more efficient licensing of certain of the Jointly Owned Patents (as such term is defined in the License Agreement).

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants herein contained, the parties hereby amend the License Agreement and agree as follows:

1.    Definitions. All terms used but not defined herein shall have the meaning given to them in the License Agreement. As used in this Amendment, the following terms shall have the meanings set forth below:

1.1    "MPEG-2 Essential Patent" shall mean any patent claiming an apparatus or a method necessary for compliance with the MPEG-2 Standard under the laws of the country which issued or published the patent.

1.2    "MPEG-2 Standard" shall mean the MPEG-2 video standard as defined in ISO documents IS 13818-1 (including annexes C, D, F, K and L), IS 13818-2 (including annexes A, B, C and D, but excluding scalable extensions), and IS 13818-4 (only as it is needed to clarify IS 13818-2).

1.3    "Joint MPEG-2 Patents" shall mean the Jointly Owned Patents which are determined to be MPEG-2 Essential Patents. The parties agree that the following two Jointly Owned Patents are MPEG-2 Essential Patents: U.S. Patent No. 4,394,774 Digital Video Compression System and Methods Utilizing Scene Adaptive Coding with Rate Buffer Feedback and U.S. Patent No. 4,698,672 Coding Systems for Redundancy Reduction. If an independent patent expert retained by a group of companies licensing MPEG-2 Essential Patents as a pool concludes that any of the remaining three Jointly Owned Patents are MPEG-2 Essential Patents, CLI shall not contest such determination.

2.    Amendment. The License Agreement is hereby modified as set forth in this Section.

2.1    Use and Licensing. Section 2.2 is hereby amended in its entirety to read as follows:



2.2    Use and Licensing.

2.2.1 Restrictions on Use. Magnitude shall have the right to practice the Jointly Owned Patents only (a) in the Charger Field of Use and (b) as authorized by the next sentence of this Section 2.2.1. NextLevel and Magnitude are hereby authorized to license the Joint MPEG-2 Patents to the MPEG-2 patent pool, presently administered by MPEG LA, LLC, and to use such patents in accordance with any sublicense granted by the MPEG-2 patent pool. CLI shall have the right to practice the Jointly Owned Patents only in any field of use other than the Charger Field of Use and in accordance with the terms of any sublicense CLI enters into with the MPEG-2 patent pool administrator. The use restrictions of this Section 2.2 shall terminate with respect to each Jointly Owned Patent upon the expiration of such Jointly Owned Patent or when there is a final determination of invalidity by a court of competent jurisdiction. The restrictions on the practice of a Jointly Owned Patent set forth in this Section shall only apply in the country in which such patent is valid and enforceable. Notwithstanding anything in this Agreement to the contrary, after the Effective Date, a party may assign its interest in a Jointly Owned Patent (subject to the restrictions and obligations set forth in this Agreement), but only in whole, not in part.

2.2.2 Licensing. In the event that a party grants a license under the Jointly Owned Patents to a third party, the licensing party agrees to execute an agreement with its licensee that binds the licensee (and its sublicensees, if any) to the field of use limitations enumerated in Section 2.2.1 above, to the extent applicable.

2.2    Payments. Magnitude shall pay CLI twenty percent (20%) of the royalty payments it receives thereafter as a result of licensing the Joint MPEG-2 Patents pursuant to Section 2.2 of the License Agreement. Such payments shall be made semiannually and shall be due on April 15 and October 15 of each year and shall be accompanied by a schedule setting forth in reasonable detail the basis upon which the royalty was calculated, including total license receipts for the MPEG-2 patent pool and Magnitude. Magnitude shall pay interest to CLI on the aggregate amount of any payments by Magnitude that are not paid on or before the date such payments are due at the lessor of (a) the maximum rate allowed under California law or (b) a rate of eighteen percent (18%) per annum.

2.3    Audits. Upon the written request of CLI and not more than once in each calendar year, Magnitude shall permit an independent certified public accounting firm of nationally recognized standing selected by CLI and reasonably acceptable to Magnitude, at CLI's expense, to have access during normal business hours to such of

CONFIDENTIAL

the records of Magnitude as may be reasonably necessary to verify the accuracy of the royalty payments hereunder for any year ending not more than thirty-six (36) months prior to the date of such request. The accounting firm shall disclose to CLI only whether the records are correct or not and the specific details concerning any discrepancies. No other information shall be shared. If such accounting firm concludes that additional royalties were owed during such period, Magnitude shall pay the additional royalties within thirty (30) days of the date CLI delivers to Magnitude such accounting firm's written report so concluding. CLI shall treat all financial information subject to review under this Section as confidential and shall cause its accounting firm to retain all such financial information in confidence under Article 7 of the License Agreement.

2.4    Representations and Warranties. Article 6 of the License Agreement is hereby amended in its entirety as follows:

6.    **Representations and Warranties.** Each party hereby represents and warrants to the other party as follows:

6.1    **Corporate Existence and Power.** Such party (a) is a corporation duly organized, validly existing and in good standing under the laws of the state in which it is incorporated; (b) has the corporate power and authority and the legal right to own and operate its property and assets, to lease the property and assets it operates under lease, and to carry on its business as it is now being conducted; and (c) is in compliance with all requirements of applicable law, except to the extent that any noncompliance would not have a material adverse effect on the properties, business, financial or other condition of such party and would not materially adversely affect such party's ability to perform its obligations under this Agreement.

6.2    **Authorization and Enforcement of Obligations.** Such party (a) has the corporate power and authority and the legal right to enter into this Agreement and to perform its obligations hereunder and (b) has taken all necessary corporate action on its part to authorize the execution and delivery of this Agreement and the performance of its obligations hereunder. This Agreement has been duly executed and delivered on behalf of such party, and constitutes a legal, valid, binding obligation, enforceable against such party in accordance with its terms.

6.3    **Consents.** All necessary consents, approvals and authorizations of all governmental authorities and other persons required to be obtained by such party in connection with this Agreement have been obtained.

c:\amendments\cli\cli-Amd.doc
8/29/97

3

CONFIDENTIAL

6.4    **No Conflict.**    The execution and delivery of this Agreement and the performance of such party's obligations hereunder (a) do not conflict with or violate any requirement of applicable laws or regulations and (b) do not conflict with, or constitute a default under, any contractual obligation of such party.

2.5    Notices.    Section 8.9 is hereby amended to provide that notices to Magnitude should be sent to:

> NextLevel Systems, Inc.
> 6262 Lusk Boulevard
> San Diego, California 92121
> Attention: General Counsel

and notices to CLI should be sent to:

> Compression Labs, Inc.
> c/o VTEL Corporation
> 108 Wild Basin Road
> Austin, Texas 78746
> Attn: Rodney S. Bond, Chief Financial Officer

3.    Full Force and Effect.    This Amendment shall be effective for all purposes as of the date first set forth above.    Except as otherwise expressly modified by this Amendment, the License Agreement shall remain in full force and effect in accordance with its terms.

4.    Counterpart Execution.    This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

IN WITNESS WHEREOF the parties hereto have executed this Amendment as of the date first set forth above.

MAGNITUDE COMPRESSION
SYSTEMS, INC.

COMPRESSION LABS, INC.

By _____

Michael R. Bernique
Vice President

By _____

Rodney S. Bond
Vice President

CONFIDENTIAL

6.4    **No Conflict.**    The execution and delivery of this Agreement and the performance of such party's obligations hereunder (a) do not conflict with or violate any requirement of applicable laws or regulations and (b) do not conflict with, or constitute a default under, any contractual obligation of such party.

2.5    <u>Notices.</u>    Section 8.9 is hereby amended to provide that notices to Magnitude should be sent to:

> NextLevel Systems, Inc.
> 6262 Lusk Boulevard
> San Diego, California 92121
> Attention:  General Counsel

and notices to CLI should be sent to:

> Compression Labs, Inc.
> c/o VTEL Corporation
> 108 Wild Basin Road
> Austin, Texas 78746
> Attn: Rodney S. Bond, Chief Financial Officer

3.    <u>Full Force and Effect</u>.  This Amendment shall be effective for all purposes as of the date first set forth above.  Except as otherwise expressly modified by this Amendment, the License Agreement shall remain in full force and effect in accordance with its terms.

4.    <u>Counterpart Execution</u>.  This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

IN WITNESS WHEREOF the parties hereto have executed this Amendment as of the date first set forth above.

MAGNITUDE COMPRESSION
SYSTEMS, INC.

COMPRESSION LABS, INC.

By _____
Michael R. Bernique
Vice President

By _Rodney S. Bond_, VP
Rodney S. Bond
Vice President

CONFIDENTIAL

Compression Labs, Inc. v. Dell Inc., et al.
Civ. A. No. 2:04-CV-159-TJW (Judge Ward)

# EXHIBIT G
# TO THE DECLARATION OF
# ERIC M. ALBRITTON



**MOTOROLA**    *Making things smarter and life better*

Home - About motorola - Products and Services - Shop          Search [          ]

‹› **Investor**
 **Information**

**Overview**

**Board of
Directors and
Senior
Management**

**Stock Quote**

**Stock Chart**

**Financial
Reports**

**Financial History**

**Stock Trading
Statistics**

**SEC Filings**

**Recent Press
Releases**

**Archived Press
Releases**

**Presentations**

**Audio Archives**

**Brokerage Firm
Equity Research
Analysts**

**Consensus
Brokerage
Research
Analyst Pro
forma Earnings
Estimates**

**Calendar**

**Info Request**

**Dividend
History/Stock
Splits**

**Mail Alert**

**Stock Purchase**

Motorola Inc. (ticker: MOT, exchange: New York Stock Exchange) News Release
- 5-Jan-2000

### Motorola and General Instrument Complete Merger

New Motorola Broadband Communications Sector Ready to
Lead the Convergence of Voice, Video and Data Technologies

SCHAUMBURG, Ill.–(BUSINESS WIRE)–Jan. 5, 2000--Motorola, Inc. (NYSE:
MOT) announced that the company and General Instrument Corporation (NYSE:
GIC) completed their previously announced merger following GIC shareholder
approval at a special meeting held today. In the merger, valued at approximately
$17 billion, each share of General Instrument was converted into 0.575 shares
of Motorola common stock.

This merger positions Motorola as a leader in the convergence of voice, video
and data technologies. The combined company will focus on broadband
solutions, which deliver interactive television, the Internet and telephone
services over wired and wireless networks.

"The completion of the merger between Motorola and General Instrument has
created the Motorola Broadband Communications Sector, a leading end-to-end
solutions provider for the exploding broadband access marketplace," said
Christopher B. Galvin, chairman and chief executive officer of Motorola, Inc.
"Motorola has been a global leader in providing integrated communications
solutions for the person, the work team, and the automobile. With this merger,
Motorola is also poised to lead the transition to converged services in the home."

Headed by Edward D. Breen, former chairman and chief executive officer of
General Instrument, the Broadband Communications Sector is the newest sector
within Motorola's Communications Enterprise. The focus of the sector is to
deliver a full range of integrated and interactive broadband access solutions to
the home along with "home hubs" to handle high-speed Internet access and
video entertainment, and carrier-quality voice services.

The Motorola Broadband Communications Sector is among the world's leading
suppliers of digital and analog set-top terminals and systems for wired and
wireless cable television networks, cable modems and modem network routers,
circuit-switched and packet-based hybrid fiber/coaxial (HFC) voice solutions,
and HFC network transmission systems used by cable operators. In addition, it
is a leading provider of digital satellite systems for programmers, direct-to-home
satellite networks and private networks for business communications.

As a result of the merger, Motorola now also holds approximately an 80 percent
stake, based on the number of shares currently outstanding, of Next Level
Communications, Inc. Next Level is a provider of broadband communications
systems that enable telephone companies to cost-effectively deliver a full suite
of voice, video and data services over the existing copper wire telephone
infrastructure.

The transaction will be accounted for as a pooling of interests. Motorola said it
intends that the merger will not be dilutive in 2000 as various potential synergies
related to cost reduction and sales growth opportunities are brought forward into

this year. The merger is expected to strengthen earnings per share in 2001 and beyond.

"The newly merged company offers broadband operators the technologies and capabilities they need to achieve their network strategies by combining GI's leadership in converged voice, video and data networks with Motorola's global reach and brand identity," said Breen. "As a leader in broadband access, we're expanding our worldwide presence and leveraging cost-saving opportunities while we focus on products and technologies to deliver converged services over cable lines and wireless networks."

The Broadband Communications Sector is positioned to offer not only access technologies, but also gateways for managing the flow of traffic from circuit-switched and packet-based backbone networks; gatekeepers to facilitate call-processing; and IP-based applications and services for the integrated network of the future. The sector expects to drive the transformation of the current hierarchically structured telecommunications network into a peer-to-peer distributed model that facilitates broader communication and expanded service offerings for the broadband marketplace.

"Motorola believes that cable industry consolidation will continue and that customers will want to build strategic partnerships with suppliers capable of providing end-to-end systems, which deliver today's solutions and the new revenue-generating services of tomorrow," said Merle L. Gilmore, executive vice president, Motorola and president of the Communications Enterprise. "This merger is about growth and catapults Motorola into a solid position in the high-growth broadband business."

About Motorola

Motorola is a global leader in providing integrated communications solutions and embedded electronic solutions. These include:

- Software-enhanced wireless telephone, two-way radio, messaging and satellite communications products and systems, as well as networking and Internet-access products, for consumers, network operators, and commercial, government and industrial customers.

- Embedded semiconductor solutions for customers in networking, transportation, wireless communications and imaging and entertainment markets.

- Embedded electronic systems for automotive, communications, imaging, manufacturing systems, computer and consumer markets.

- Digital and analog systems and set-top terminals for broadband cable television operators.

Motorola's and General Instrument's combined sales on a pro forma basis in 1998 were $31.3 billion.

For more information, visit us on the Web at www.motorola.com.

Business Risks:

Statements about Motorola's future financial performance, the accounting treatment of the transaction, continuing consolidation in the cable industry, and the business of Motorola's new Broadband Communications Sector are forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. It is uncertain whether any of the events anticipated by the forward-looking statements will transpire or occur, or, if any of them do so, what impact they will have on the results of operations and financial condition of the Broadband Communications Sector, Motorola or the price of its stock. Motorola wishes to caution the reader that the following factors and those

in its 1999 Proxy Statement on pages F-15 through F-18, in its Form 10-Q for the period ending October 2, 1999, and in its other SEC filings could cause the actual results of Motorola or the Broadband Communications Sector to differ materially from those in the forward-looking statements: the ability of the companies to successfully integrate General Instrument's business, capitalize on the combined technologies and realize synergies in terms of growth and cost savings; the ability of the combined companies to meet the demand for new products at lower costs; the continued growth of the interactive TV market and the impact of regulation on such growth; the availability of the favorable tax treatment and accounting treatment for the merger; and factors affecting the continued consolidation in the cable industry.

NOTE TO EDITORS:

Advisory to Follow

Media are invited to participate by phone at the 2:30 pm EST press conference by dialing 1-800-967-7184 (domestic) and 001-719-457-2633 (international). The reservation number is 862875. A replay of the conference call is available for 48 hours beginning at 3:30 pm EST Jan. 5 through Jan. 7. The replay can be accessed by dialing 1-888-203-1112 (domestic) or 001-719-457-0820 (international). When prompted to gain access, you will need to punch reservation number - 862875.

B-roll will be available at 1:30 pm-2:00 pm EST at Galaxy 7, Transponder 2, Downlink 3740 vertical.

```
CONTACT: Motorola
         Media:
         Tim Kellogg, 847/538-1484
         Investor Relations:
         Ed Gams, 847/576-6873
              OR
         General Instrument
         Media:
         Sharon Corbitt, 215/323-1873
         Investor Relations:
         Dario Santana, 215/323-1213
```

© Copyright 1994-2001 motorola, Inc. All Rights Reserved.
Home | Terms of Use | Privacy Practices | Contact Us

Compression Labs, Inc. v. Dell Inc., et al.
Civ. A. No. 2:04-CV-159-TJW (Judge Ward)

# EXHIBIT H
# TO THE DECLARATION OF
# ERIC M. ALBRITTON

093091

AGREEMENT dated as of September 30, 1991 between INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation (hereinafter called IBM), and MOTOROLA, INC., a Delaware corporation (hereinafter called MOTOROLA).

Each of the parties has the right (as GRANTOR herein) to grant licenses to the other party (as GRANTEE herein) under certain patents and desires to acquire a nonexclusive license under such patents of the other party.

Each of the parties expects to continue research and development which will produce further patents and each party may require a nonexclusive license under such patents of the other party.

In consideration of the premises and mutual covenants herein contained, IBM and MOTOROLA agree as follows:

Section 1.     Definitions

1.1  "Information Handling System" shall mean any instrumentality or aggregate of instrumentalities primarily designed to compute, classify, process, transmit, receive, retrieve, originate,

switch, store, display, manifest, measure, detect, record, reproduce, handle or utilize any form of information, intelligence or data for business, scientific, control or other purposes.

1.2  "IHS Product" shall mean an Information Handling System or any instrumentality or aggregate of instrumentalities (including, without limitation, any component or subassembly) designed for incorporation in an Information Handling System; provided, however, that a Manufacturing Apparatus shall not be considered to be an IHS Product.

1.3  "Manufacturing Apparatus" shall mean any instrumentality or aggregate of instrumentalities primarily designed for use in the fabrication of an IHS Product or Supply licensed herein.

1.4  "Supply" shall mean any article or matter designed for use in or by, and adapted to be effectively consumed in the course of operation of an IHS Product licensed herein.

1.5  "Complex" shall mean an aggregate of instrumentalities, which is the combination of one or more IHS Products licensed herein with other apparatus which is not an IHS Product, Manufacturing Apparatus, Program or Supply.

1.6 "Program" shall mean a plurality of instructions capable of being executed by an IHS Product or a Complex, whether or not such instructions are in a machine-readable form.

1.7 "Licensed Patents" shall mean all patents throughout the world, including utility models and including design patents and registrations for type fonts (but not including any other design patents or registrations), issued or issuing on patent applications entitled to an effective filing date prior to July 1, 1996, under which patents or the applications therefor GRANTOR or any of its Subsidiaries now has, or hereafter obtains, the right to grant licenses to GRANTEE of or within the scope granted herein without such grant or the exercise of rights thereunder resulting in the payment of royalties or other consideration by GRANTOR or its Subsidiaries to third parties (except for payments between GRANTOR and Subsidiaries of GRANTOR, and payments to third parties for inventions made by said third parties while employed by GRANTOR or any of its Subsidiaries). The term "Licensed Patents" shall also include said patent applications and any patent reissuing on any of the aforesaid patents.

1.8 "Semiconductor Material" shall mean any material whose conductivity is intermediate to that of metals and insulators at room temperature and whose conductivity, over some temperature

range, increases with increases in temperature. Such materials shall include but not be limited to refined products, reaction products and reduced products. Semiconductor Material shall not include any material which exhibits superconductivity at a temperature in excess of twenty degrees Kelvin (20° K).

1.9 "Semiconductor Device" shall mean a device comprising a body of one or more Semiconductor Materials having one or more electrodes associated therewith and, if provided therewith, housing and/or supporting means therefor.

1.10 "Semiconductor Circuit" shall mean a circuit in which one or more Semiconductor Devices are interconnected in one or more paths (including passive circuit elements, if any) for performing electrical or electronic functions and, if provided therewith, housing and/or supporting means therefor.

1.11 "Integrated Circuit" shall mean an integral unit including a plurality of active and/or passive circuit elements formed at least in part of Semiconductor Material and associated on, or in, one substrate comprising the first level of packaging for such elements, such unit forming, or contributing to the formation of, a circuit for performing electrical or electronic function.

-4-

1.12 "Semiconductor Product" shall mean any Semiconductor Material, Semiconductor Device, Semiconductor Circuit and/or Integrated Circuit.

1.13 "RF Communications" shall mean the transfer of information from one point to another by means of electromagnetic waves in free space and having a frequency in that portion of the electromagnetic spectrum that is between the audio-frequency portion and the infrared portion; i.e., 10 Kilohertz to 100,000 Megahertz.

1.14 "RF Communications Apparatus" shall mean that portion of any IHS Product designed to receive voice signals from an individual and at least in part capable of providing said voice signals to individual(s) by RF Communications without perceived intervening delay, including related channel control, allocation, and signalling apparatus. RF Communications Apparatus shall include Paging Apparatus.

1.15 "Paging Apparatus" shall mean that portion of any IHS Product primarily designed to be portable and which receives a signal by RF Communications and in response to such signal alerts the recipient by audible, visual, or other physical means and/or displays or stores for subsequent retrieval a message

representative of such signal, wherein such signal is not generated in response to any recipient initiated request and such portion of such IHS Product has no other response capability except for the recipient's capability to transmit a limited acknowledgement.

1.16 "RF Network Apparatus" shall mean that portion of an IHS Product which is designed to convert signals representing data into a form particularly suitable for transmission by means of RF Communications together with such additional apparatus, such as RF amplifiers, RF antennas, RF transmitters, RF receivers, and RF traffic management equipment, as is utilized to perform such transmission and, when such signals are received, to detect and convert such signals to a form suitable for use in other IHS Products and that portion a data communications system that is particularly adapted to support the RF transmission of such data signals.  RF Network Apparatus shall not include that portion of IHS Products which monitor data communication traffic for the purpose of signal evaluation, rerouting, traffic management other than RF, or RF Communications Apparatus.

1.17 "RF Products" shall mean RF Communications Apparatus and RF Network Apparatus.

1.18 "Licensed Products" shall mean IHS Products, Programs, Supplies, Complexes and any combination of any, some or all of the foregoing. Any such combination shall be considered a Licensed Product even though its elements are leased, sold or otherwise transferred at different times. Licensed Products shall include Semiconductor Products which are not IHS Products. Licensed Products shall exclude RF Products, in the case of IBM, and RF Network Apparatus, in the case of MOTOROLA; provided, however, an RF Product shall not be excluded simply by virtue of use in such RF Product of a Semiconductor Product covered by a Licensed Patent, unless such Semiconductor Product is specifically designed for use in such RF Product or is used in combination with one or more other Semiconductor Products or with other parts or portions of such RF Product, which combination is covered by a Licensed Patent.

1.19 "Subsidiary" shall mean a corporation, company or other entity:

1.19.1    more than fifty percent (50%) of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are, now or hereafter, owned or controlled, directly or indirectly, by a party hereto, but such corporation, company or other

-7-

entity shall be deemed to be a Subsidiary only so long as such ownership or control exists; or

1.19.2    which does not have outstanding shares or securities, as may be the case in a partnership, joint venture or unincorporated association, but more than fifty percent (50%) of whose ownership interest representing the right to make the decisions for such corporation, company or other entity is, now or hereafter, owned or controlled, directly or indirectly, by a party hereto, but such corporation, company or other entity shall be deemed to be a Subsidiary only so long as such ownership or control exists.

Section 2.    <u>Licenses and Immunities</u>

2.1 Subject to the provisions of Section 2.4, each party (as GRANTOR herein) on behalf of itself and its Subsidiaries grants to the other party (as GRANTEE herein) a worldwide, fully nonexclusive license under GRANTOR's Licensed Patents:

2.1.1    to make, have made, use, lease, sell and/or otherwise transfer Licensed Products and to practice any method or process involved in the manufacture or use thereof; and

2.1.2    to make, have made and/or use Manufacturing Apparatus and to practice and have practiced any method or process involved in the manufacture or use thereof.

In the event that neither GRANTOR nor any of its Subsidiaries has the right to grant a license under any particular Licensed Patent of the scope set forth above in this Section 2, then the license granted herein under said Licensed Patent shall be of the broadest scope which GRANTOR or any of its Subsidiaries has the right to grant within the scope set forth above.

2.2  Each party (as GRANTOR herein) on behalf of itself and its Subsidiaries, hereby grants to the users of IHS Products and Complexes manufactured, leased, sold or otherwise transferred by the other party (as GRANTEE herein) or its sublicensed Subsidiaries within the scope of the licenses granted to GRANTEE under this Agreement, an immunity from suit under GRANTOR's Licensed Patents:

2.2.1    on condition, in each of the following three cases, that GRANTEE or its sublicensed Subsidiary made a written proposal in a specific customers situation, or otherwise participated in, the:

2.2.1.1    use of such IHS Product and Complexes;

2.2.1.2    formation and use of any Complex which includes any such IHS Product or Complex, whether or not such formed Complex includes other apparatus not furnished by GRANTEE or any of its sublicensed Subsidiaries; and

2.2.1.3    formation and use of any combination of any

such IHS Product, which is not an RF Communications

Apparatus, or any Complex mentioned in this Section 2.2

with Programs, whether or not the Programs are

furnished by GRANTEE;

provided, however, that such immunity shall not be construed

to cover any apparatus per se forming a part of any Complex,

or any Program per se, which apparatus or Program is not

furnished by GRANTEE or its sublicensed Subsidiary; and

2.2.2    the formation and use of any combination of such IHS

Products and Complexes and the Complexes of Section 2.2.1.2

with Supplies, whether or not such Supplies are furnished by

GRANTEE or its sublicensed Subsidiary; provided, however,

that such immunity shall not extend to the manufacture,

lease, sale or other transfer of such Supplies which are not

furnished by GRANTEE or its sublicensed Subsidiary.

An RF Product made under the immunity granted in Section 2.4

shall be treated as a licensed IHS Product for purposes of this

Section 2.2.

2.3  Each party (as GRANTOR herein) grants to the users of

Programs and/or Supplies leased, licensed, sold or otherwise

transferred by the other party or any of its sublicensed

Subsidiaries, an immunity from suit under GRANTOR's Licensed

Patents for the formation and use of any combination of such Programs and/or Supplies with IHS Products which are not RF Communications Apparatus, and/or Complexes, whether or not such IHS Products and Complexes are furnished by said other party or its sublicensed Subsidiary; provided, however, that such immunity shall not extend to the manufacture, lease, sale or other transfer of any IHS Product or Complex, or any portion or portions thereof, which is not furnished by said other party or its sublicensed Subsidiary.

An RF Product made under the immunity granted in Section 2.4 shall be treated as a licensed IHS Product for purposes of this Section 2.3.

2.4  MOTOROLA, on behalf of itself and its Subsidiaries, hereby grants an immunity from suit under MOTOROLA's Licensed Patents to IBM and its Subsidiaries for the making of RF Network Apparatus prior to July 1, 1996, and for the use and sale of such RF Network Apparatus, and to the customers, direct and indirect, of IBM and its Subsidiaries for the use of such RF Network Apparatus manufactured by IBM or its Subsidiaries prior to July 1, 1996.

MOTOROLA, on behalf of itself and its Subsidiaries, grants to IBM and it Subsidiaries an immunity from suit under MOTOROLA's Licensed Patents for the making, using and selling, subsequent to

July 1, 1996, of products which are identical to those products made under the immunity granted in this Section 2.4 and to any other RF Network Apparatus under development prior to July 1, 1996, by IBM or its Subsidiaries and to the customers, direct and indirect, of IBM and its Subsidiaries for the use of such products. "Under development" as used in this Section 2.4 and Section 2.5 means that the engineering drawings for a model or working prototype of such RF Network Apparatus have been completed.

2.5  IBM, on behalf of itself and its Subsidiaries, hereby grants an immunity from suit under IBM's Licensed Patents to MOTOROLA and its Subsidiaries for the making of RF Network Apparatus prior to July 1, 1996, and for the use and sale of such RF Network Apparatus, and to the customers, direct and indirect, of MOTOROLA and its Subsidiaries for the use of such RF Network Apparatus manufactured by MOTOROLA or its Subsidiaries prior to July 1, 1996.

IBM, on behalf of itself and its Subsidiaries, grants to MOTOROLA and it Subsidiaries an immunity from suit under IBM's Licensed Patents for the making, using and selling, subsequent to July 1, 1996, of products which are identical to those products made under the immunity granted in this Section 2.5 and to any other

-12-

RF Products under development prior to July 1, 1996, by MOTOROLA or its Subsidiaries, and to the customers, direct and indirect, of MOTOROLA and its Subsidiaries for the use of such products.

2.6  No license, or immunity is granted hereunder to either party to have made RF Products.

2.7  No license or immunity is granted by either party hereto either directly or by implication, estoppel or otherwise to any third parties acquiring items from either party for the combination of items licensed hereunder with other items or for the use of such combination, except as provided in Sections 2.2, 2.3, 2.4 and 2.5.

Section 3.    Extension of License to Subsidiaries

3.1  The licenses granted herein shall include the right of the parties hereto to sublicense their respective Subsidiaries and the right of such sublicensed Subsidiaries to sublicense other Subsidiaries.  Each sublicensed Subsidiary shall be bound by the terms and conditions of this Agreement (other than those of Sections 5.1 and 5.2) as if it were named herein in the place of the party with whom the sublicense originated.  If a Subsidiary ceases to be a Subsidiary and holds any patents or patent applications under which

a party hereto is licensed, such licenses will continue for the life of such patents or patent applications.

Any sublicense granted to a Subsidiary shall terminate on the date such Subsidiary ceases to be a Subsidiary.

3.2  In the event a sublicensed Subsidiary of one party hereto is an Operating Subsidiary (as hereinafter defined) at the time it ceases to be a Subsidiary and, with the written approval of said one party, requests in writing, within one hundred and eighty (180) days after ceasing to be a Subsidiary, a license agreement with the other party hereto upon terms and conditions substantially identical with the terms and conditions of this Agreement (except as hereinafter provided), the other party hereto agrees that it will enter into such license agreement forthwith.  An Operating Subsidiary shall be any Subsidiary of one party hereto which at the time it ceases to be a Subsidiary has all of the following:

3.2.1     a line of marketable products;

3.2.2     patents or other intellectual property relating to the line of marketable products;

3.2.3     tangible assets at least equivalent in value to the lesser of twenty-five million U.S. dollars ($25,000,000) or twenty percent (20%) of the total assets of the party of which it was formerly a Subsidiary; and

3.2.4    at the time of entry into such license agreement, it is not a corporation, company or other entity:

3.2.4.1    more than fifty percent (50%) of whose outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) are; or

3.2.4.2    which does not have outstanding shares or securities, as may be the case in a partnership, joint venture or unincorporated association, but more than fifty percent (50%) of whose ownership interest representing the right to make the decisions for such corporation, company or other entity is;

owned or controlled, directly or indirectly, by a third party. Any such agreement with an Operating Subsidiary shall differ from this Agreement in the following respects:

3.2.5    this Section 3.2 and Sections 4 and 5 shall be omitted;

3.2.6    the name of the Operating Subsidiary shall be substituted for the name of the party hereto of which it was formerly a Subsidiary; and

3.2.7    in the event that such Operating Subsidiary is or becomes organized under the laws of a country different from that of the party hereto of which it was formerly a Subsidiary, such license agreement shall contain such additional terms and

-15-

conditions (other than royalty provisions) as may exist in patent license agreements between the other party hereto and other entities organized under the laws of the same country.

Section 4.    <u>Release</u>

4.1 Each party, on behalf of itself and its Subsidiaries which are Subsidiaries as of the date of this Agreement, hereby irrevocably releases the other party, its Subsidiaries which are Subsidiaries as of the date of this Agreement, and its and their respective customers, mediate and immediate, from any and all claims of infringement of any of its Licensed Patents, which claims have been made or which might be made at any time, with respect to any item manufactured, used, leased, sold or otherwise transferred by or for the other party or its Subsidiaries before the effective date of this Agreement, and with respect to any method practiced in the manufacture or use of such item, to the extent that such item or method would have been licensed or the subject of any immunity hereunder had it been manufactured, used, leased, sold or otherwise transferred or practiced after the date of this Agreement; provided, however, the release herein granted shall not apply to any Licensed Product which was made by another manufacturer prior to the date first written above for the use, lease, sale or other transfer by or for the other party.

-16-

Section 5.     Payments, Royalties, Reports and Options

Redacted

-17-

Redacted

Redacted

-19-

Redacted

Redacted

Section 6.    Other License Rights

6.1  It is recognized that the parties hereto or their respective Subsidiaries may now have, or hereafter obtain, the right to grant licenses and immunities under one or more patents of any country, including utility models and including design patents and registrations for type fonts (but not including any other design patents or registrations), issuing on patent applications entitled to an effective filing date prior to July 1, 1996, and under the patent applications therefor, but that such grant or the exercise of rights thereunder will result in payment of royalties or other consideration by GRANTOR or its Subsidiaries to third parties.  Each party (as GRANTOR herein) agrees that, upon written request, it will grant to the other party to the extent and subject to the terms and conditions under which it then has the right to do so, a license and immunity of the broadest scope which GRANTOR has the right to grant at any time but of no greater scope than the scope of the licenses and immunities granted herein with respect to any such patent or patent application.  Such license and immunity shall be granted under a separate agreement, upon payment of the same royalty or other consideration as that which GRANTOR or any of its Subsidiaries is obligated to pay to a third party because of the grant of such license and immunity or the exercise of rights thereunder.

-22-

6.2  Upon written request by a party, the other party will inform the requesting party of those patents or patent applications coming within the scope of Section 6.1 at the time of such request.

Section 7.    Term of Agreement

7.1  The term of this Agreement shall be from the date first written above until the expiration of the last to expire of the Licensed Patents.

7.2  In the event that more than fifty percent (50%) of the outstanding shares or securities (representing the right to vote for the election of directors or other managing authority) of one party hereto hereafter become owned or controlled, directly or indirectly, by a third party, said one party shall promptly give notice of such acquisition to the other party.  If said one party does not have outstanding shares or securities, such acquisition shall be deemed to occur if more than fifty percent (50%) of its ownership interest representing the right to make decisions for said party is acquired by said third party.  All rights granted hereunder to said one party together with any sublicenses theretofore granted by said one party shall terminate on a termination date one hundred and eighty (180) days after the date of such acquisition.

-23-

In the event of such acquisition,

7.2.1     all licenses and immunities granted herein to said other party under any patents issuing on patent applications having an effective filing date subsequent to said termination date and under said patent applications shall terminate; and

7.2.2     said one party shall be entitled, upon request made within one hundred and eighty (180) days after the date of such acquisition to a nontransferable, nonexclusive, license and immunity under said other party's Licensed Patents (including the right to sublicense its Subsidiaries) to make, use, lease and sell only products identical with those manufactured and marketed and to practice any process then being practiced in the manufacture of such identical products by said one party within the licenses and immunities granted in this Agreement prior to such acquisition. As consideration for such license and immunity, said one party shall be required to pay to said other party fifty percent (50%) of any payments which said one party would have been obligated to pay after the date of acquisition pursuant to Section 5 of this Agreement. Such license and immunity shall be terminable by said third party upon any date a payment is due, by giving written notice of

termination thirty (30) days prior to such due date and paying all payments due on such date.

Section 8.    <u>Warranty</u>

8.1  Each party represents and warrants that it has the full right and power to grant the license, immunities and release set forth in Sections 2 and 4 and that there are no outstanding agreements, assignments or encumbrances inconsistent with the provisions of said Sections or with any other provision of this Agreement.  Each party (as a GRANTOR) further represents and warrants that, to the best of its knowledge, prior to the execution of this Agreement it has informed the other party of any patent originating from inventions made by employees of GRANTOR or its Subsidiaries, which patent is now owned by GRANTOR or its Subsidiaries and which patent, owing to prior arrangements with third parties, does not, or will not, qualify as a Licensed Patent, under which licenses are granted of the full scope set forth in Section 2.1.  Neither party makes any other representations or warranties, express or implied, nor does either party assume any liability in respect of any infringement of patents or other rights of third parties owing to the other party's operation under the license herein granted.

Section 9.   <u>Communications</u>

9.1 Any payment, notice or other communication required or permitted to be made or given to either party hereto pursuant to this Agreement shall be sent to such party by registered airmail (except that registered or certified mail may be used where delivery is in the same country as mailing), postage prepaid, addressed to it at its address set forth below, or to such other address as it shall designate by written notice given to the other party, and shall be deemed to have been made or given on the date of mailing.  The addresses are as follows:

9.1.1     For IBM,

> IBM Director of Commercial Relations
> International Business Machines Corporation
> 2000 Purchase Street
> Purchase, New York  10577

9.1.2     For MOTOROLA,

> Corporate Vice President
>   General Patent Counsel
> Motorola, Inc.
> 1303 East Algonquin Road
> Schaumburg, IL 60196

Any wire transfer required to be made under this Agreement shall be sent to:

9.1.3     If to IBM:

> IBM Director of Commercial Relations
> IBM Corporation - Account No. 143-41-826
> Morgan Guaranty Trust Company
> 23 Wall Street
> New York, New York 10015

-26-

Section 10.    <u>Assignments</u>

10.1 Neither party shall assign, or grant any right under, any of its patents, or the applications therefor, which qualify as Licensed Patents, or any of its patents or the applications therefor or rights which are subject to the other party's rights pursuant to Section 6, unless such assignment or grant is made subject to the terms and conditions of this Agreement.  Subject to the provisions of Section 3, neither party shall assign any of its rights or privileges hereunder without the prior written consent of the other party.  Any attempted assignment in derogation of the foregoing shall be void.

Section 11.    <u>Know-How and Trade Secrets</u>

11.1 No license or other right is granted herein to either party, directly or by implication, estoppel or otherwise, with respect to any trade secrets or know-how, and no such license or other right shall arise from the consummation of this Agreement or from any acts, statements or dealings leading to such consummation. Except as specifically provided herein, neither party is required hereunder to furnish or disclose to the other any technical or other information.

Section 12.    <u>Interest on Overdue Payments</u>

Redacted

Section 13.    <u>Applicable Law</u>

13.1 This Agreement shall be construed, and the legal relations between the parties hereto shall be determined, in accordance with the law of the State of New York, United States of America.

Section 14.    <u>Miscellaneous</u>

14.1 Nothing contained in this Agreement shall be construed as a warranty or representation by either party as to the validity or scope of any of its Licensed Patents and either party is free to contest in any proceeding said validity or scope.



14.2 Nothing contained in this Agreement shall be construed as conferring any right to use in advertising, publicity, or other promotional activities any name, trade name, trademark, or other designation of either party hereto (including any contraction, abbreviation or simulation of any of the foregoing); and each party hereto agrees not to use or refer to this Agreement or any provision thereof in any promotional activity associated with apparatus licensed hereunder, without the express written approval of the other party.

14.3 Nothing contained in this Agreement shall be construed as conferring on either party any license or other right to copy the exterior design of the products of the other party.

14.4 Nothing contained in this Agreement shall be construed as conferring any rights by implication, estoppel or otherwise, to or under copyrights or mask work or similar rights, or with respect to Programs under any form of statutory protection now existing or hereafter enacted, in any country or countries, wherein the copying of a Program is a requisite of infringement under such form of protection.

14.5 Nothing contained in this Agreement shall be construed as limiting the rights which the parties have outside the scope of the licenses granted hereunder, or restricting the right of

either party or any of its Subsidiaries to make, have made, use, lease, sell or otherwise dispose of any particular product or products not herein licensed.

14.6 Each party shall, upon request from the other party sufficiently identifying any patent or patent application, inform the other party as to the extent to which said patent or patent application is subject to the licenses and rights granted hereunder. If such licenses or rights under said patent or patent application are restricted in scope, copies of all pertinent provisions of any contract or other arrangement creating such restrictions shall, upon request, be furnished to the party making such request, unless such disclosure is prevented by such contract, and in that event a statement of the nature of such restriction will be provided.

14.7 Neither of the parties hereto, nor any of their respective Subsidiaries shall be required hereunder to file any patent application, or to secure any patent or patent rights, or to maintain any patent in force, or to provide copies of patent applications to the other party or its Subsidiaries, or to disclose any inventions described or claimed in such patent applications.

14.8 Neither party shall have any obligation hereunder to institute any action or suit against third parties for infringement of any of its Licensed Patents or to defend any action or suit brought by a third party which challenges or concerns the validity of any of its Licensed Patents.    In addition, neither party shall have any right to institute any action or suit against third parties for infringement of any of the other party's Licensed Patents.

14.9 It is recognized that one party hereto may have granted to a third party licensing rights with respect to a patent or a patent application which would otherwise qualify as a Licensed Patent under this Agreement, such rights being subject to payment to the granting party of royalties or other consideration in respect of licenses extended by such third party to another.    In any such event, the one party shall promptly repay or cause to be repaid to the other party hereto any royalties or other monetary consideration which the granting party receives or is entitled to receive from such third party as a result of such third party's extension to the other party of a license under the affected patent or patent application of or within the scope of the license granted under Section 2 of this Agreement.

14.10 Any item which was made, had made, leased, sold or otherwise transferred by a party licensed under this Agreement, or its sublicensed Subsidiary, shall be considered to be licensed under any Licensed Patent of the other party which at any time covers such Licensed Products, whether or not the making, having made, sale, lease or other transfer occurs prior to the issuance of said Licensed Patent and regardless of the country in which such act by said licensed party occurs.

14.11 Each party shall pay all taxes (including, without limitation, sales and value added taxes) imposed by the national government, including any political subdivision thereof, of any country in which said party is doing business, as the result of said party's furnishing consideration hereunder.  In the event such a tax becomes payable as a result of a party's furnishing consideration in respect of a sublicense granted to any of its Subsidiaries pursuant to Section 3.1, said sublicensing party shall be responsible for determining the amount of and paying, or causing said sublicensed Subsidiary to pay, said tax.

14.12  This Agreement will not be binding upon the parties until it has been signed hereinbelow by or on behalf of each party, in which event it shall be effective as of the date first above written.  No amendment or modification hereof shall be valid or

binding upon the parties unless made in writing and signed as aforesaid.  This Agreement embodies the entire understanding of the parties with respect to the subject matter hereof and merges all prior discussions between them, and neither of the parties shall be bound by any conditions, definitions, warranties, understandings or representations with respect to the subject matter hereof other than as expressly provided herein.

14.13  If any Section of this Agreement is found by competent authority to be invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such Section in every other respect and the remainder of this Agreement shall continue in effect so long as the Agreement still expresses the intent of the parties.  If the intent of the parties cannot be preserved, this Agreement shall be either renegotiated or terminated.

14.14  The headings of the several Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

-33-

IN WITNESS WHEREOF, the parties hereto have caused this
Agreement to be duly signed as of the date first above written.

INTERNATIONAL BUSINESS
MACHINES CORPORATION

By _____

    H. G. Figueroa
    Vice President

Witness:

MOTOROLA, INC.

By _____

Witness:

-34-

Compression Labs, Inc. v. Dell Inc., et al.
Civ. A. No. 2:04-CV-159-TJW (Judge Ward)

# EXHIBIT I
# TO THE DECLARATION OF
# ERIC M. ALBRITTON

CONFIDENTIAL

## AGREEMENT RELATING TO LICENSE
### AND
### CO-OWNERSHIP AGREEMENT

THIS AGREEMENT (the "Agreement"), effective as of the 25nd day of January, 2002, is entered into by FORGENT NETWORKS, INC., a Delaware corporation formerly known as "VTEL Corporation" ("Forgent"), on its own behalf and on behalf of its wholly owned subsidiary Compression Labs, Incorporated, a Delaware corporation ("CLI"), and General Instrument Corporation, a Delaware corporation ("GI") (collectively, the "Parties").

### RECITALS:

WHEREAS, CLI and Magnitude Compression Systems, Inc. ("Magnitude") and their respective successors are parties to certain agreements relating, inter alia, to the ownership of U.S. Patent Nos. 4,698,672 and 4,394,774 and foreign counterparts (the "Jointly Owned Patents") (such agreements, as amended, are referred to collectively as the "Co-Ownership Agreement");

NOW, THEREFORE, in consideration of the foregoing premises and mutual covenants herein contained, the Parties agree as follows:

1.       Forgent represents and warrants to GI that CLI is a wholly owned subsidiary of Forgent, that CLI is a co-owner of the Jointly Owned Patents and that Forgent has the authority to act on behalf of CLI with respect to the exercise of CLI's rights set forth in the Co-Ownership Agreement.

2.       GI represents and warrants to Forgent and CLI that Magnitude, formerly a wholly owned subsidiary of GI, has been merged into GI and its separate existence has ceased effective January 16, 2001; that GI, as the successor of Magnitude, is a co-owner of the Jointly Owned Patents and that GI has the authority to act with respect to the exercise of rights of Magnitude set forth in the Co-Ownership Agreement.

3.       The Parties acknowledge and confirm that GI has the exclusive right to use and license the claims under the Jointly Owned Patents in the broadcast business as it was historically conducted by CLI prior to its sale to Magnitude and as such business has evolved (the "Broadcast Field"), without any accounting to Forgent or CLI.

4.       The Parties acknowledge and confirm that Forgent, on behalf of CLI, has the exclusive right to use and license the claims under the Jointly Owned Patents in all fields, without any accounting to GI or Magnitude, except in the Broadcast Field.

5.       The Parties acknowledge and confirm that GI has been authorized under the Co-Ownership Agreement to enter into that certain License from Licensor to Licensing

1

Administrator (the "MPEG LA License Agreement"), dated July 1, 1997 between GI and MPEG LA, L.L.C. ("MPEG LA"), pursuant to which the Jointly Owned Patents were licensed to MPEG LA, in its capacity as administrator of the MPEG 2 patent pool. Except as provided in paragraph 6 hereof, MPEG LA, in its capacity as administrator of the MPEG 2 patent pool, may grant non-exclusive sublicenses of the MPEG 2 patent claims pursuant to the MPEG LA License Agreement, which sublicenses are not required by the Co-Ownership Agreement to be limited to the Broadcast Field.

6.      The Parties further acknowledge and confirm that the foreign counterparts of U.S. Patent No. 4,698,672 have been removed from the MPEG-2 patent pool administered by MPEG LA (the "Foreign Counterparts"). The Parties acknowledge and confirm that (i) GI has the exclusive right to use and license, without any accounting to Forgent or CLI, the Foreign Counterparts in the Broadcast Field, and (ii) Forgent, on behalf of CLI, has the exclusive right to use and license, without any accounting to GI or Magnitude, the Foreign Counterparts in all fields except the Broadcast Field.

7.      The Parties further acknowledge and confirm that the Broadcast Field does not include the manufacture, distribution or sale of products that implement or use the JPEG standard including such products as digital still cameras, digital still image devices, digital camcorders with a still image function, scanners, slide imagers and personal computers.

8.      The Parties hereby amend the second sentence of Section 2.2 of the Amendment to the Co-Ownership Agreement to read as follows:

> "Such payments shall be made quarterly and the quarterly payments: (i) shall be due on January 31, April 30, July 31 and October 30 of each year, (ii) shall consist of twenty percent (20%) of all royalty payments received by GI pursuant to the MPEG LA License Agreement relating to the Jointly Owned Patents during the relevant quarter up to the 14th day preceding the end of the relevant quarter, and (iii) shall be accompanied by a scheduled setting forth in reasonable detail the basis upon which the royalty was calculated, including the license receipts for the MPEG-2 patent pool and GI."

Section 2.2 of such Amendment, as amended by this Paragraph 8, shall continue in full force and effect.

9.      In further consideration of the agreements of GI contained herein, Forgent, in its capacity as a reseller of Polycom videoconferencing systems, hereby agrees to provide preferred pricing on such systems to GI, with respect to all such systems as GI may choose to purchase from Forgent for as long as Forgent is a reseller of Polycom systems. Such preferred pricing shall consist of Forgent's fully burden cost of such systems, plus 10%, which Forgent represents is approximately equal to its profit from the sale of such systems.

10.     GI has been advised by Forgent and CLI that Forgent and CLI are endeavoring to commercialize the Jointly Owned Patents in CLI's fields of use. Forgent and CLI shall defend, indemnify and hold GI, and its employees, directors and agents harmless against any judgment,

CONFIDENTIAL

damage, liability, loss or third party claim (including reasonable legal fees) ("Liability") incurred by them arising out of the efforts of Forgent and CLI to commercialize the Jointly Owned Patents. Within twenty (20) days after receipt of notice by a party indemnified hereunder of any claim for which indemnity or defense is to be sought hereunder, such indemnified party shall give notice in writing to Forgent of such claim; provided, however, the failure to notify Forgent within twenty (20) days will not relieve Forgent or CLI from any liability that it may have to any indemnified party under this Agreement, except to the extent Forgent demonstrates that the investigation or defense of any action arising from such claim is prejudiced by the indemnified party's failure to give notice. If any legal or other proceeding is commenced against an indemnified party and it gives notice to Forgent as provided herein, Forgent will be entitled to participate in such proceeding and, to the extent it wishes, to assume the defense of such proceeding with counsel satisfactory to the indemnified party, and after notice from Forgent to the indemnified party of its election to assume the defense of such proceeding, Forgent, as long as it diligently conducts such defense, shall not be liable to the indemnified party for any fees of other counsel or any other expenses with respect to the defense of the proceeding, other than reasonable costs of investigation. If Forgent assumes the defense, no compromise or settlement of such claims may be effected without the indemnified party's prior written approval unless (i) there is no finding or admission of any violation of law, or any violation of the rights of any person and no effect on any other claims that may be made against the indemnified party, and (ii) the sole relief is monetary damages paid in full by Forgent; and in any case, neither Forgent or CLI nor any indemnified party shall have any liability with respect to any compromise or settlement effected without its written consent.

11.    Notwithstanding any confidentiality agreement among the Parties, each Party consents to the furnishing of this Agreement by any other Party to third parties in connection with licensing efforts undertaken by any Party hereto of the Jointly Owned Patents, provided that this Agreement is submitted to such third parties pursuant to a customary nondisclosure agreement binding such third parties to maintain the confidential nature of this Agreement.

12.    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which, together, shall constitute one and the same instrument. A telecopy or facsimile transmission of a signed counterpart of this Agreement shall be sufficient to bind the party whose signature appears hereon. The Parties shall execute and deliver such additional documents and take such actions as another Party shall reasonably request or as shall be reasonably necessary or appropriate in connection with the effectuation of the purposes of this Agreement.

13.    Except as amended or clarified hereby, the Co-Ownership Agreement shall remain in full force and effect.

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

GENERAL INSTRUMENT CORPORATION

By: _____
Name: Lee S. Zimmerman
Title: Vice President

COMPRESSION LABS, INC.

By: _____
Jay Peterson, Vice President and
Chief Financial Officer

FORGENT NETWORKS, INC.
(formerly known as VTEL Corporation)

By: _____
Jay Peterson, Vice President and
Chief Financial Officer

CONFIDENTIAL

4

TOTAL P.02

<u>Compression Labs, Inc. v. Dell Inc., et al.</u>
Civ. A. No. 2:04-CV-159-TJW (Judge Ward)


# EXHIBIT J
# TO THE DECLARATION OF
# ERIC M. ALBRITTON

Welcome to MPEG LA



**MPEG-2**

## THE PATENT LIST

This is the list of patents (Attachment 1) covered by the
MPEG-2 Patent Portfolio License as of July 1, 2004.

MPEG-2 Attachment 1

## ALCATEL

US 4,970,590
DE 68924764
FR 0374548
GB 0374548
IT 1228109
JP 3,011,338
SE 0374548

DE 69011422
FR 0401638
GB 0401638
IT 1,230,235
SE 0401638

## CANON INC.

US 4,982,270
JP 2,674,059

## COLUMBIA UNIVERSITY

US Re 35,093
CA 2,096,431-C
DE 69129595
DE 69130329
FR 0564597
FR 0630157
GB 0564597
GB 0630157
JP 2,746,749

MPEG-2 Attachment 1

## FRANCE TELECOM R&D

US 4,796,087
DE 3767919
FI 86241
FR 2599577
GB 0248711
IT 0248711
SE 0248711

## FUJITSU

US 5,235,618
CA 2,029,320
DE 69030056.5
FR 0431319
GB 0431319
JP 2,787,599

## GE TECHNOLOGY DEVELOPMENT, INC.

US 4,706,260

US 4,813,056
DE 3855203 T2
FR 0395709
GB 0395709
HK 1,004,307
JP 2,790,509
SG 63561

US 5,426,464